(No. 56043.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lee, v. CLIFFORD ANDERSON, Appellant.

*Opinion filed June 20, 1986.*

2

James J. Doherty, Public Defender, of Chicago (Karen A. Popek and Richard E. Cunningham, Assistant Public Defenders, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Michael E. Shabat, Joan S. Cherry and Timothy J. Joyce, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SIMON delivered the opinion of the court:

On September 5, 1978, the defendant, Clifford Anderson, shot and killed the manager and the engineer of the apartment building where he lived and was employed as a janitor. He was indicted on two counts of murder and two counts of armed violence. At trial he defended on the ground of insanity. His first trial in the circuit court of Cook County ended in a mistrial when the jury could not reach a verdict. Ten days later the defendant was tried a second time and found guilty on all counts. After

a bifurcated sentencing hearing, the jury sentenced him to death. The case is before us on direct appeal (87 Ill. 2d R. 603).

The defendant concedes that the only material issue at trial was his sanity, and thus an extended discussion of the facts is unnecessary. To establish his defense, the defendant called a psychiatrist, his roommate, and his sister. The psychiatrist had interviewed Anderson and reviewed various psychiatric and criminal records, as well as letters written by or at the direction of Anderson. In response to a hypothetical question, the expert testified that the defendant could not conform his conduct to the requirements of the law at the time of the shootings. On cross-examination he stated that the defendant probably was unable to appreciate the criminality of his acts.

The defendant's roommate and cousin, Ora Russell, related that Anderson had been concerned for months that the building was "going condo" and that Anderson had him write two or three hundred letters to various agencies complaining about what Anderson perceived was happening. Anderson was apparently fired from his job on September 2. Anderson woke Russell up at 6 a.m. on the morning of September 5 and appeared not to have slept. At Anderson's request, Russell wrote letters and made phone calls to a government agency, the news media, and a union. After speaking to the union, defendant seized a gun and went out. The shootings followed. Russell said he thought Anderson was "crazy" and described his behavior on the day of the killings as "wild."

Anderson's sister testified to a history of mental illness in the family. She also identified certified commitment papers on the defendant's mother and brother.

In rebuttal the State presented its own psychiatric expert, who concluded that Anderson was legally sane. By stipulation, a written statement of another psychia-

trist who believed that the defendant was sane was also introduced. In addition, the prosecution elicited testimony from three building residents who witnessed some of the events of September 5 and said that they had never noticed anything unusual about Anderson or seen him in a rage. The arresting police officer and an assistant State's Attorney who interviewed the defendant on the day of the shootings both stated that Anderson appeared normal.

The defendant raises some 35 issues on this appeal concerning his convictions and the sentence of death which was imposed. We need only address two of these.

The defendant contends that he was denied a fair trial when the State introduced evidence of his responses to *Miranda* warnings to establish his sanity. Officer Ken Riess testified that, shortly after the defendant arrived at the lockup, his partner read the *Miranda* warnings to the defendant and the defendant replied that "he understood and that he had no more to say to us." The officer stated that Anderson subsequently requested a lawyer. The evidence was admitted over defense objection, and the trial judge instructed the jury that it could only be used "for the limited purpose of considering the state of mind, the ability to comprehend, to understand what his mental condition was."

Assistant State's Attorney Michael Melber testified that when he read Anderson his rights later in the day, the defendant said that he understood the rights and, after inquiring about the condition of the victims, again asked for an attorney. The judge reiterated that the evidence could be used in a "limited fashion only as bearing upon the issue of the defendant's mental condition." In both initial and rebuttal closing arguments, the prosecution emphasized that the defendant's responses to the *Miranda* warnings showed his "ability to appreciate the criminality of his act and to conform his conduct to the

law."

This case is controlled by our recent decision in *People v. Stack* (1986), 112 Ill. 2d 301. In *Stack*, the prosecution sought to disprove a claim of insanity by showing that the defendant was lucid enough to invoke his privilege against self-incrimination shortly after the incident. This court, following a decision by the United States Supreme Court on the identical issue (*Wainwright v. Greenfield* (1986), 474 U.S. 284, 88 L. Ed. 2d 623, 106 S. Ct. 634), held that the introduction of such evidence breached the promise implicit in the *Miranda* warnings that the exercise of the fifth amendment privilege would not be used against the defendant and thus deprived him of a fair trial. The court also determined in *Stack* that the rule applied in *Greenfield* should be given retroactive effect. 112 Ill. 2d 301.

The State asserts that any error in admitting testimony concerning the defendant's responses to the *Miranda* warnings was harmless because it was offered only to establish that the defendant was able to appreciate the criminality of his conduct. According to the State, the evidence worked no prejudice since the defense (in its view) was based solely on the other prong of the insanity test, the inability of the accused to conform his conduct to the requirements of the law (Ill. Rev. Stat. 1983, ch. 38, par. 6—2).

Even assuming the State's unsupported thesis that the responses did tend to prove that the defendant appreciated the criminality of his conduct but did not bear on the ability to conform, the State's argument fails here. The prosecution explicitly told the jury that the evidence established the defendant's sanity under both prongs of the insanity defense, and this argument was consistent with the judge's admonitions. The State cannot now maintain that the jury ignored the advice and disregarded the evidence. The State's additional argu-

ment that the error was harmless because the other evidence of sanity was overwhelming is without merit given the sharp disagreement of the expert witnesses on the question. The defendant's convictions must therefore be reversed and the cause remanded for a new trial.

A further question which arose at both of the defendant's previous trials, and which is likely to recur at a new trial, is to what extent the defendant's expert witness could disclose to the jury the basis for his diagnosis. Specifically, the defendant challenges the judge's ruling that his psychiatric expert could not reveal facts or opinions contained in reports upon which he relied in making his diagnosis. The defendant also argues that the court was incorrect in preventing the psychiatrist from recounting specific statements made by the defendant to him. Because these questions are of importance to the proper consideration of the insanity defense, we proceed to address them in turn.

The trial judge refused to allow any disclosure of the contents of the reports upon which the defendant's expert witness, Dr. Jerome Katz, relied in forming his opinion. These reports included evaluations by psychiatrists, doctors, and counselors made while Anderson was in the army and while he was incarcerated in California, reports by the State's psychiatric experts, and information relating to a previous criminal offense. Dr. Katz was allowed only to state that he utilized these reports.

After this court's decisions in *People v. Ward* (1975), 61 Ill. 2d 559, and *Wilson v. Clark* (1981), 84 Ill. 2d 186, it is undisputed that even though reports made by others may be substantively inadmissible, an expert may utilize them in forming his opinion as long as experts in the field reasonably rely on such materials. Nor is there any question that the psychiatric profession reasonably and customarily relies on records of the kind at issue here; both Dr. Katz and the State's expert, Dr. Gerson Ka-

plan, testified that a patient's psychiatric history is one of the most important criteria in making a diagnosis. (See also *United States v. Lawson* (7th Cir. 1981), 653 F.2d 299, 302 (taking judicial notice that psychiatrists customarily rely upon other psychiatric and investigative reports).) The only question is whether the rationale of *Ward* and *Wilson* also allows the psychiatric expert to explain the basis of his opinion by referring to relevant matters in the reports.

At issue in *Ward* was a diagnosis by the prosecution's psychiatric expert which was grounded in a personal interview with the accused as well as a review of other reports, including evaluations by another psychiatrist and a psychologist. In addition to stating his opinion that the defendant was sane, the doctor disclosed the findings of some of the secondhand sources. This court, relying on Rule 703 of the Federal Rules of Evidence (Fed. R. Evid. 703), held that expert medical opinion on the question of sanity based in part on records compiled by others which had not been admitted into evidence was permissible if the reports "are of a type customarily utilized by the medical profession." *People v. Ward* (1975), 61 Ill. 2d 559, 568.

The State correctly notes that *Ward* did not explicitly hold that it was proper for the psychiatrist to reveal the contents of the reports he relied upon in arriving at his diagnosis. The majority of appellate cases following *Ward*, however, have interpreted it as implicitly deciding that the underlying facts and opinions could be disclosed. See *Henry v. Brenner* (1985), 138 Ill. App. 3d 609; *People v. Castro* (1983), 113 Ill. App. 3d 265; *In re Germich* (1981), 103 Ill. App. 3d 626, and cases cited therein; but see *People v. Clemons* (1979), 72 Ill. App. 3d 860.

The defendant points to *Ward* and the appellate court decisions for support, and adds that this court's opinion in *Wilson v. Clark* (1981), 84 Ill. 2d 186, clarifies that

expert witnesses may disclose the contents of otherwise inadmissible materials upon which they reasonably rely. In *Wilson*, the court prospectively adopted Rules 703 and 705 of the Federal Rules of Evidence to govern all cases involving expert testimony. Rule 703 provides:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." (Fed. R. Evid. 703.)

Rule 705 states:

> "The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Fed. R. Evid. 705.

Rule 705, which was enacted to eliminate the necessity for the hypothetical question and to place the burden for eliciting the facts upon which an expert opinion is based on the cross-examiner (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 194-95), does not clearly answer whether such facts may be brought out on direct examination. Nor does Rule 703 by its terms resolve this issue. However, in our judgment the logic underlying Rule 703 and this court's decisions in *Ward* and *Wilson* compels the conclusion that an expert should be allowed to reveal the contents of materials upon which he reasonably relies in order to explain the basis of his opinion.

Rule 703 was designed to " 'broaden the basis for expert opinions *** and to bring the judicial practice into line with the practice of the experts themselves when not in court.' " (*People v. Ward* (1975), 61 Ill. 2d 559, 567, quoting Advisory Committee Note to Rule 703.) The

rule thus expands the range of information available, at least indirectly, to the trier of fact. Inasmuch as the opinion based on these materials—which are deemed trustworthy by the profession—is allowed, it would be both illogical and anomalous to deprive the jury of the reasons supporting that opinion.

This conclusion accords with the overwhelming weight of authority from other jurisdictions as well as a great deal of persuasive scholarly commentary. See *Paddack v. Dave Christensen, Inc.* (9th Cir. 1984), 745 F.2d 1254; *United States v. Ramos* (11th Cir. 1984), 725 F.2d 1322; *American Universal Insurance Co. v. Falzone* (1st Cir. 1981), 644 F.2d 65; *United States v. Madrid* (10th Cir. 1982), 673 F.2d 1114; *United States v. Harper* (5th Cir. 1971), 450 F.2d 1032; *United States v. Sims* (9th Cir. 1975), 514 F.2d 147; *O'Gee v. Dobbs Houses, Inc.* (2d Cir. 1978), 570 F.2d 1084; *Brown Mechanical Contractors, Inc. v. Centennial Insurance Co.* (Ala. 1983), 431 So. 2d 932; *People v. Stone* (1974), 35 N.Y.2d 69, 315 N.E.2d 787, 358 N.Y.S.2d 737; *State v. Myers* (1976), 159 W. Va. 353, 222 S.E.2d 300; E. Cleary & M. Graham, Illinois Evidence sec. 703.1, at 473, 493 (4th ed. 1984); Rothstein, Rules of Evidence for the United States Courts and Magistrates 289 (2d ed. 1985); Saltzburg and Redden, Federal Rules of Evidence Manual 671 (4th ed. 1986); ABA Section of Litigation, *Emerging Problems Under the Federal Rules of Evidence* 209, 214-15; Diamond and Louisell, *The Psychiatrist as an Expert Witness: Some Ruminations and Speculations*, 63 Mich. L. Rev. 1335, 1353-54 (1965); Dieden and Gasparich, *Psychiatric Evidence and Full Disclosure in the Criminal Trial*, 52 Calif. L. Rev. 543, 544 (1964).

To prevent the expert from referring to the contents of materials upon which he relied in arriving at his conclusion "places an unreal stricture on him and compels him to be not only less than frank with the jury but also

\*\*\* to appear to base his diagnosis upon reasons which are flimsy and inconclusive when in fact they may not be." (*State v. Myers* (1976), 159 W. Va. 353, 358, 222 S.E.2d 300, 304.) Absent a full explanation of the expert's reasons, including underlying facts and opinions, the jury has no way of evaluating the expert testimony (*State v. Allison* (1983), 307 N.C. 411, 298 S.E.2d 365) and is therefore faced with a "meaningless conclusion" by the witness (*State v. Griffin* (1965), 99 Ariz. 43, 49, 406 P.2d 397, 401).

We reject the State's suggestion that the jury was adequately apprised of the basis of Dr. Katz' opinion because he identified the sources of the reports. The mere fact that the doctor utilized specified background material did not tell the jury "which opinions he credited, which he rejected, and why." (See *United States v. Harper* (5th Cir. 1971), 450 F.2d 1032, 1037.) As the court in *Harper* aptly stated:

> "In a case such as this, in which expert witnesses express different conclusions as to the defendant's mental condition at the time of the alleged offense, it is important that the jury know upon what facts the expert witness based his conclusion. As we have said on several occasions, 'expert opinion as to insanity rises no higher than the reasons upon which it is based.' " 450 F.2d 1032, 1037.

The trial court ruled, and the State maintains here, that the information in the records utilized by Dr. Katz constitutes inadmissible hearsay and that Rule 703 was not intended to create an exception to the hearsay rule. Of course, by even allowing an expert to consider such materials in forming an opinion they are indirectly brought before the jury. More fundamentally, however, the State's argument misapprehends the hearsay rule. Hearsay is an extrajudicial statement offered in court "to show the truth of the matters asserted." (*People v.*

*Carpenter* (1963), 28 Ill. 2d 116, 121.) Although the contents of the reports relied upon by Dr. Katz would clearly be inadmissible if offered for their truth, the defense seeks to allow the expert to disclose the underlying facts and conclusions not for their truth but for the limited purpose of explaining the basis for the expert witness' opinion. For this limited purpose the statements do not constitute hearsay, and can therefore be allowed. See, *e.g., Paddack v. Dave Christensen, Inc.* (9th Cir. 1984), 745 F.2d 1254, 1262; *United States v. Ramos* (11th Cir. 1984), 725 F.2d 1322.

It is true that an uninformed jury could misuse this type of information as substantive proof of insanity. We do not believe that this possibility is a sufficient reason to deny the jury an adequate basis for assessing the weight and credibility of expert opinion. A limiting instruction, advising the jury to consider the underlying statements only to evaluate the basis of the expert's opinion, should forestall any such misuse. (*United States v. Madrid* (10th Cir. 1982), 673 F.2d 1114; *United States v. Harper* (5th Cir. 1971), 450 F.2d 1032, 1037; *Brown Mechanical Contractors, Inc. v. Centennial Insurance Co.* (Ala. 1983), 431 So. 2d 932, 944; Saltzburg and Redden, Federal Rules of Evidence Manual 671 (4th ed. 1986).) A trial judge, of course, need not allow the expert to recite secondhand information when its probative value in explaining the expert's opinion pales beside its likely prejudicial impact or its tendency to create confusion.

The final question to be addressed, which was expressly left open in *People v. Gacy* (1984), 103 Ill. 2d 1, 71, is whether a psychiatric expert may be precluded from relating statements made to him by the defendant which figure in his diagnosis. Because, as Dr. Katz testified, psychiatrists customarily rely on statements made by a patient in forming a diagnosis (Diamond and

Louisell, *The Psychiatrist as an Expert Witness: Some Ruminations and Speculations*, 63 Mich. L. Rev. 1335, 1350 (1965); Dieden and Gasparich, *Psychiatric Evidence and Full Disclosure in the Criminal Trial*, 52 Calif. L. Rev. 543, 550 (1964)), an expert must be allowed to repeat those statements if relevant to explaining the opinion to the jury (*State v. Myers* (1976), 159 W. Va. 353, 222 S.E.2d 300; *State v. Allison* (1983), 307 N.C. 411, 298 S.E.2d 365).

The State argues that this court should continue to hew to the line recognized in *People v. Hester* (1968), 39 Ill. 2d 489, which held that a nontreating expert physician, unlike a treating expert, could not give an opinion based upon statements made to him by the accused because of the self-serving nature of the statements. In view of this court's later conclusion in *Wilson v. Clark* (1981), 84 Ill. 2d 186, that Rule 703 makes no distinction between treating and nontreating physicians and that either may express an opinion founded on any information reasonably relied upon by experts in the field, the State's argument has already been rejected. To the extent that a savvy defendant's statements tending to show mental illness might be consciously self-serving, this possibility can adequately be brought out on cross-examination of the expert.

The convictions are reversed and the cause remanded for a new trial.

*Reversed and remanded.*