THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. P.T., Defendant-Appellant.

Second District   No. 2—90—0924

Opinion filed August 25, 1992.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, and Beth Katz, of Evanston, for appellant.

Daniel A. Fish, State's Attorney, of Dixon (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, P.T., appeals from the order of the circuit court of Lee County adjudicating him a sexually dangerous person under section 1.01 of the Sexually Dangerous Persons Act (Act) (Ill. Rev. Stat. 1991, ch. 38, par. 105—1.01). He was committed to the Department of Corrections in Menard, Illinois. On appeal, he contends the trial court erred by denying his motion *in limine*. In the motion, he sought to exclude from the jury all testimony regarding incidents in which he had sexual contact with animals 30 years prior to the charge. Since the testifying psychiatrists relied upon the incidents in formulating their opinions, the issue on appeal is whether the undue prejudice of the testimony outweighed its probative value.

On April 25, 1990, defendant was charged with aggravated sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1)) for molesting his three-year-old daughter, M.T. The State also filed a petition to commit defendant under the Act. Defendant was also charged with the battery of his sister-in-law, D.S. (Ill. Rev. Stat. 1989, ch. 38, par. 12—3), and criminal trespass to her property (Ill. Rev. Stat. 1989, ch. 38, par. 21—3).

Prior to the trial, defense counsel filed a motion *in limine* to exclude testimony regarding the earlier acts of bestiality. The trial court denied the motion on the ground that the acts were considered by the psychiatrists when they formulated their opinion of defendant's condition.

At trial, K.T. testified that she was the wife of defendant and that he was the father of M.T. and their son J.T., who was five years old. On April 22, 1990, she saw defendant grab the chest of her sister-in-law, D.S. D.S., who was 26 or 27 years old, was married to K.T.'s brother.

Dr. Carl Aagesen testified that he was a board-certified psychiatrist. He examined defendant for about 1 hour and 15 minutes on

June 11, 1990. In his examination, he used defendant's answers and defendant's admissions which appeared on the police reports. Aagesen stated that defendant suffered from a paraphilia, namely, pedophilia, and had a probable personality disorder of a schizoid type. Aagesen also found a possibility of mental deficiency because defendant may have had an IQ below 70, although Aagesen did not formally make that diagnosis because defendant had only a limited education.

Aagesen defined his terms. A paraphilia is a significant disturbance of sexual function where the impulses are discharged in channels that are not normal for human adults. If the object of the sexual energy is a child, the disturbance is labelled pedophilia; if the object of the impulse is an animal, the label is zoophilia. If there is no outward act, a paraphilia is diagnosed only if the subject is under repeated extreme emotional discomfort as a result of the urges. Without the mental discomfort, an actual act must be committed to form the basis of the diagnosis.

Aagesen also testified that he diagnosed defendant as having a schizoid personality disorder. The characteristics of the disorder are long-standing, normally beginning in childhood or adolescence. Defendant had a disorder in relating to other people such that he had a lifestyle of distant relationships without bonding. Defendant remained disconnected from the mainstream of human values, which implied a greater possibility for the emergence of deviant sexual behavior. Aagesen believed that defendant's illness rendered him liable to having continuing occurrences of his impulses and thus he had a propensity to be sexually dangerous. Aagesen believed that children would remain the focus of defendant's sexual attention and energy. Aagesen based his opinion regarding defendant's propensity on the reports of sexual contact with his daughter and son, the animals and with his brother in adolescence. Defendant admitted to Aagesen that he had touched the genitals of animals and had had intercourse with a cow when he was an adolescent. Defendant denied that he had made contact with his son or daughter and called the allegations lies but admitted that it was possible that the events could have happened. Defendant also experienced hearing some words repeated intermittently for a period of three years, but this symptom was not specific to any diagnosis.

Dr. Werner Tuteur testified he was a board-certified psychiatrist, was the former clinical director of the Elgin Mental Health Center and was the former chief of the section of psychiatry at the American Academy of Forensic Sciences. On June 8, 1990, Tuteur examined defendant in a one- or two-hour session. Tuteur used defendant's an-

swers and the police reports in the examination. Tuteur determined that defendant had a borderline intellectual condition but was not quite mentally deficient. The mental deficiency eventually led to the molesting of children. For many years, defendant never had mature relationships with women because he was afraid of them and did not dare approach them. A man with defendant's type of personality approached children because they are easier to approach. All his life, defendant endeavored to make contacts with people, and that endeavor resulted in contacts with people who were his intellectual and emotional equal, namely, children. Tuteur told defendant that the police reports suggested defendant molested 10 other children whose names defendant could not recall; defendant told Tuteur he would not do it again. Defendant also told Tuteur of a sexual contact with a brother in childhood.

Tuteur believed that the mental disorder had existed since defendant was in school, at least 30 years ago. The pedophilia had lasted for as long as the time when he started molesting children, but that time period was unknown. Tuteur believed that, if given the opportunity, defendant would again approach children in an indecent manner for sexual contact. Tuteur concluded that defendant was a sexually dangerous person as defined by the statute.

On cross-examination, Tuteur admitted that, because defendant's intellect was borderline, he could easily be led by others in a conversation. Tuteur noted that people in custody try to give authorities the answers that they think the authorities wish to hear.

D.S. testified that she was a frequent guest in defendant's home and hosted defendant and his family in her home. In March and April 1990, she witnessed defendant commit many indecent acts. On the evening of April 22, M.T. refused to go to bed. Defendant walked into the bedroom, and M.T. jumped into bed and pulled up the covers. Defendant pulled down the covers and put his hand in her underpants. He fondled her in the area of her clitoris and vagina. When D.S. protested, defendant said he was playing with M.T. because he wanted to see if she was wet. D.S. removed M.T. to the bathroom to change her. D.S. noticed that M.T.'s crotch was red and that a white creamy pus was coming from the vagina.

The next day, M.T. came into D.S.'s house to use the bathroom. She had urine running down her leg, and D.S. got a paper towel to help clean her. Defendant entered, grabbed the paper towel and put it down M.T.'s underwear. He removed the tissue and started to fondle M.T.'s clitoris and vagina with his middle finger. D.S. told defendant

that he was sick and she would stop him, but defendant laughed and left with M.T.

D.S. also testified that, earlier that month, while defendant's wife had taken J.T. to the bathroom, defendant put M.T. on his lap on the couch. He put her on his "privates" and bounced her up and down. They were fully clothed. Defendant said that "this is how you prime them to get them ready to f--- them." Another time, D.S. saw defendant stick a garden hose between his legs and tell J.T. to suck it; the water was not running. Later the same evening, defendant grabbed M.T.'s nipples and said "too bad they're not big enough to suck." Another time, D.S. saw defendant fondle M.T. when he changed her panties.

D.S. also related that, in January or February 1990, defendant told her that he had grabbed women at his workplace. He showed her his citations for these acts. D.S. also testified that several times defendant grabbed her own breasts. Once, while she was in the bathroom, defendant entered and grabbed D.S. by the crotch and breasts and said "he wanted to f---" her.

Keane Hudson was a detective sergeant of the Lee County sheriff's department. He interviewed defendant on April 24, which was just after D.S. reported the commission of the acts against M.T. Defendant admitted that he fondled her, but said he had not done it very often and only for about two months. Edwin Blake, another detective, made a video tape of one of the interviews, and the tape was played for the jury. With an agent of the Department of Children and Family Services, Blake interviewed defendant again. In the taped interview, defendant had denied sexual contact with J.T., but in the later interview Blake asked him if he had oral sex with his son, and defendant responded affirmatively. The act occurred two weeks prior to the interview. Defendant said he had oral sex with his brother 40 years ago. Defendant admitted rubbing his penis against M.T. to the point of ejaculation. Defendant told Blake that he had intercourse with a cow when he was 19 and that, when he lived in Oregon, he had a dog that would lick his penis. Defendant stated he had oral sex with about 10 other children but could not remember their names. He stated that he thought about grabbing the paper girl's breasts, which she was just starting to develop.

Defendant's father testified that, when defendant was 20, he received an injury while working on a farm. A hammer mill exploded and threw defendant into the air. His head landed in a grinder which chopped six holes in his skull. Defendant was unconscious and spent 31 days in the hospital. Since that time, defendant complained of

headaches and had difficulty conversing. Defendant had some difficulty in understanding statements. He was reluctant to talk to people and often walked away from conversations.

During closing argument, the State's Attorney claimed Dr. Aagesen diagnosed defendant as having zoophilia. The State's Attorney also made the following statements:

> "He's not able to control those [sexual urges] and he takes them out on whatever may be [the] most convenient object before him, adult, a little boy, little girl or animals. *** He has these propensities, these sexual urges that he cannot control and given the opportunity and the circumstances I submit to you that he again will fulfill those sexual urges on other people, young boys, young girls, animals and particularly on people who cannot defend themselves.

> *** He is indiscriminate. Makes no difference to him, be it other adults, be [sic] young boy, young girl or animals, any one of those he will use to fulfill his sexual urges."

Defendant did not object to the prosecutor's arguments that defendant was likely to assault animals.

Following the closing arguments and instructions, the jury returned a verdict finding defendant to be a sexually dangerous person. The trial court denied defendant's post-trial motion, and he appeals. Defendant contends that the evidence concerning the bestiality was not relevant to any issue before the jury and was unduly prejudicial and this fact was demonstrated when the prosecutor inflamed the jury with improper characterizations of the evidence.

Section 1.01 of the Act provides the following definition:

> "All persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children, are hereby declared sexually dangerous persons." (Ill. Rev. Stat. 1989, ch. 38, par. 105—1.01.)

This language requires proof of three separate elements:

> "(1) the existence of a mental disorder for more than one year; (2) the existence of criminal propensities to the commission of sex offenses; and (3) the existence of demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children." (People v. Allen (1985), 107 Ill. 2d 91, 105, aff'd (1986), 478 U.S. 364, 92 L. Ed. 2d 296, 106 S. Ct. 2988.)

The purpose of the Act, which provides for a civil proceeding, is to provide treatment, not punishment, of sexually dangerous persons. *Allen*, 107 Ill. 2d at 99-101.

Defendant notes that the statute applies to prevent sex offenses against humans only and not animals. Moreover, defendant notes that the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 1—1 *et seq.*) does not criminalize sexual contact against animals. (*Cf.* Ill. Rev. Stat. 1991, ch. 8, par. 703.01 (cruelty to animals).) Prior to the enactment of the Code, the State prohibited "crimes against nature," which included unnatural acts by humans with animals. The legislative history reveals that it was no longer necessary or desirable to proscribe unnatural acts with animals criminally unless such acts are covered by disorderly conduct or similar statutes, because, when such acts occur, they are usually brief, youthful experiments rather than part of a pattern of conduct that either contributes to or constitutes a significant degradation of the individual involved. (See Ill. Ann. Stat., ch. 38, par. 11—2, Committee Comments, at 175 (Smith-Hurd 1979).) Focusing public attention on the person who happens to be found in such an act serves no social purpose and may seriously impair the development of the accused to a normal life. See Ill. Ann. Stat., ch. 38, par. 11—2, Committee Comments, at 175 (Smith-Hurd 1979).

■ Defendant contends that the instances of bestiality were not relevant to any element of section 1.01 since the actions were neither offenses proscribed by law nor offenses directed against humans. Defendant also argues that the evidence should also have been excluded even though it was used to support an expert's opinion. An expert may disclose the contents of otherwise inadmissible materials which form the basis of his opinion. (*People v. Anderson* (1986), 113 Ill. 2d 1, 11-12.) Absent a full explanation of an expert's reasons, including the underlying facts and opinions, the jury has no way of evaluating the expert testimony. (113 Ill. 2d at 11.) However, a "trial judge, of course, need not allow the expert to recite secondhand information when its probative value in explaining the expert's opinion pales beside its likely prejudicial impact or its tendency to create confusion." 113 Ill. 2d at 12.

Defendant argues that the evidence had little probative value since a significant amount of time had elapsed as the event occurred nearly 30 years ago; defendant had been only an adolescent; the event appeared to be only an isolated incident; and it was not relevant to the diagnosis of pedophilia. Under the Act, a defendant must be tried on the basis of his current mental condition rather than his past condition. (*People v. Studdard* (1980), 82 Ill. App. 3d 736, 740.) Neither

psychiatrist diagnosed defendant as being a zoophiliac, or an on-going zoophiliac, even if such a diagnosis were relevant under section 1.01. Thus, defendant contends the probative value in explaining the expert's opinion was slight compared to the sensational nature of the evidence. Contrary to the State's Attorney's argument, there was no evidence that defendant was likely to molest animals.

■ However, evidence of prior sex acts may be admissible to prove that the defendant has a propensity to commit sex crimes and that his mental disorder has existed for more than one year. (*Studdard,* 82 Ill. App. 3d at 741.) Dr. Tuteur testified that defendant's mental deficiency lasted for more than 30 years. Tuteur explained that defendant's disorder prevented him from making contacts with adult human beings and he approached children because they were easier to influence. Defendant's contact with the cow 30 years ago is consistent with this diagnosis that he did not know how to approach humans as his equals. Thus, the evidence was not used to support a conclusion that defendant was a zoophiliac but rather to support the conclusion that he had a long-standing mental disorder. While defendant denied to Dr. Tuteur that he had the animal contact, Tuteur could base his information on the admissions as related by Blake. Defendant also admitted the contact to Dr. Aagesen, and Aagesen specifically stated that his diagnosis was based on the defendant's contact with his daughter and son, the animals, and his brother. Aagesen noted that defendant's personality disorder was long-standing and probably began in adolescence. The disorder was a failure to relate to human beings evidenced by a lifelong pattern of distant relationships from human beings. Defendant's isolation created a greater possibility for the emergence of deviant sexual values and behaviors. Thus, the contact with the animals was symptomatic of the diagnosis of the personality disorder and the long-standing nature of it. The probative value of the evidence was not so slight that its introduction should be excluded because of its inflammatory nature. See *Anderson,* 113 Ill. 2d at 12.

We also note that defense counsel could have requested a *voir dire* to interview the experts prior to the examination before the jury to determine whether they could state their opinions without reference to the animal contact. Instead, counsel stipulated that the doctors had in fact used the inflammatory evidence in reaching their conclusions. Even if the defendant had sought the examination, the evidence was relevant because it allowed the jury to determine that the doctors' diagnoses were based on facts which occurred more than a year before the trial. Without the testimony regarding defendant's

adolescent behavior, there was little concrete evidence to support the conclusion that defendant's mental disorder manifested itself prior to the two-month period before defendant's arrest. Thus, the evidence was properly admissible. The jury had the right to know the facts, whether strong or weak, upon which the experts based their opinions, to evaluate those opinions. *Anderson*, 113 Ill. 2d at 11.

For the above reasons, the order of the circuit court of Lee County is affirmed.

Affirmed.

WOODWARD and GEIGER, JJ., concur.