# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE

## STATE OF TENNESSEE v. LUTHER RAY DOTSON, JR.

**Direct Appeal from the Circuit Court for Rhea County**
**No. 14146      J. Curtis Smith, Judge**

---

## No. E1999-00640-CCA-R3-CD - Decided
### May 3, 2000

---

The defendant, Luther Ray Dotson, appeals from his conviction by a jury for first degree murder. He contends that the evidence is insufficient, that the trial court erred by refusing to grant an ex parte hearing on his motion for an expert, that the trial court erred by limiting the testimony of his expert on suicide, and that the trial court's jury instruction on circumstantial evidence was improper. We hold that the evidence is sufficient; that although the trial court erred by not granting the defendant an ex parte hearing and by limiting his expert's testimony, the errors were harmless; and that the trial court's jury instruction was proper. We affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

TIPTON, J., delivered the opinion of the court, in which WELLES, J., joined. SMITH, J.,filed a concurring opinion.

R. Jeffery Harmon, Jasper, Tennessee, for the appellant, Luther Ray Dotson, Jr.

Paul G. Summers, Attorney General of Tennessee; Patricia C. Kusmann, Assistant Attorney General; and James Michael Taylor, District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Luther Ray Dotson, Jr., appeals as of right following his conviction by a jury in the Rhea County Circuit Court for first degree murder. The defendant received a sentence of life imprisonment in the custody of the Department of Correction. He presents the following issues:
1. whether the evidence is sufficient to support his conviction;
2. whether the trial court erred by refusing to grant an ex parte hearing on the defendant's motion for resources to hire an expert on suicide;
3. whether the trial court erred by not allowing the defendant's expert on suicide to testify that the victim told others she had made previous suicide attempts; and
4. whether the trial court's jury instruction on circumstantial evidence was improper.

We affirm the judgment of conviction.

The defendant, who was forty-six at the time of the offense, was convicted of first degree murder for the shooting death of his live-in girlfriend, seventeen-year-old Crystal Braden. At trial, Charles Byrd, Chief Deputy of the Rhea County Sheriff's Department, testified that he was dispatched to the defendant's house on December 8, 1995, at 3:45 a.m. He testified that when he arrived at 5:00 a.m., he saw a handgun lying on the kitchen table and pieces of a broken chair on the kitchen floor. He said he went into the defendant's bedroom and found the victim's body lying on a piece of plastic with a plastic bag over her head. He said he secured the scene until Tennessee Bureau of Investigation (TBI) Agent David Emiren arrived.

Chief Deputy Byrd testified that he spoke with the defendant after the defendant had been read his rights and placed in the back of a patrol car. He said he took notes detailing the defendant's statement. The statement, which was read into evidence, provides as follows:

It was around 2:30 this morning. I remember the time, because Married with Children was on. Me and Crystal had been reading the Bible. I'd been telling her what she was doing wrong. I'd been whipping her for it. I whipped her last night.

I walked out to the mailbox to get the paper. I heard the paper man when he brought the paper, that was about 30 minutes earlier, but when Married with Children came on I walked out to get the paper. About halfway to the box I heard a shot. I turned around and started to go back in to see what happened, but I thought Crystal was just f***ing with me, so I went on and got the paper. When I came back in I saw Crystal lying with her head across the right arm of the chair with her right leg under her in the living room where the round table is. I could hear something like air spewing or blowing. The blood was running in the floor [and] about a half circle of puddle was in the floor to the right of the chair. The gun was lying about a foot away from her left foot between the round table. I picked up the gun and wiped it off then I ejected the hull and laid it on the kitchen table. I cleaned her up, put her clothes in a sack. They were messy. I was afraid to call the law. I knew they would think I did it. I took the chair apart. I put a plastic bag over her head to keep from dragging blood all through the house. I put her on the plastic and thought about getting rid of her. I made two or three cups of coffee while I was tearing the chair up. My dad was in bed. He got up and came in there. I told him he needed to leave the house. I have washed my hands numerous times. It was like a dream. I loved her. She lived here since March, I think. We were having a sexual relationship. The Bible was laying on the table. After this happened I went back out the front door to get some fresh air. I don't think daddy saw her. I stood between her and daddy and told him to go on and he left. Lately I've been physical with her a little ever [sic] night. At first I was hitting her in the face and head. I was hitting her in the stomach, but I quit doing that. Mainly had been pinching her ears and titties. Also pinched her stomach. She would squeal. Daddy would - - could hear - - daddy couldn't hear. He was always in his room and this would always happen in the bedroom. Daddy hardly ever came out of his room . . . . The last time we had sex was night before last. I think about five different guys had been coming around and beating on the doors and windows. I watched Crystal close so she couldn't get out. I never really caught her with

anyone.  She just told me about it.  Tony Galvin, Jamie Goins . . . and someone named Jim.

The gun was a nine millimeter and it's mine.  I didn't kill her.  She's right handed I think.  She shot herself in the left side of the head.  That's strange.

. . . .  I wasn't going to kill her, but I had been planning to kill Tony Galvin.

Chief Deputy Byrd testified that according to his notes, the defendant stated that the victim shot herself in the living room and that he took her to his bedroom and placed her on plastic.  He said that he had previously stapled a curtain over the doorway so the victim could not leave the room without him knowing.  He stated that the victim had been thinking about shooting herself and had handled guns before.  The defendant iterated that he pinched the victim's ears and that they were badly swollen.  He stated, "I don't feel nothing right now, love or anything.  I can't say I wanted to kill her.  She made me angry.  I wasn't proud of hurting her."  Chief Deputy Byrd testified that he did not allow the defendant to read the statement or make corrections.  He said he tested the defendant's hands for gunshot residue and gave the test kit to Agent Emiren.

Agent David Emiren of the TBI testified that he arrived at the defendant's house around 7:00 a.m.  He said he saw a large sheet of plastic stapled to the top of a dresser in the defendant's bedroom.   He said the plastic hung down to the floor and extended underneath the victim's body.  He said another sheet of plastic covered most of the victim's body.  He testified that he found the victim's clothes in a grocery bag, a .9 millimeter pistol, and a dismantled chair in the kitchen.  He said that the cushions from the chair were in garbage bags.  Agent Emiren testified that he found a bullet hole in the living room wall that extended through the wall and into the adjoining storage room.  He said that in the storage room, the bullet passed through a paperback book on a shelf, through a lampshade and onto the floor.  He testified that he found an expended cartridge hull under the couch cushions in the living room.  He said he found rags used to wipe up blood in a plastic bag in the kitchen.  He said that later that afternoon, he found that day's newspaper with blood on it tucked between the mattress and box springs in the defendant's bed.

Agent Emiren testified that he took a statement from the defendant on December 8 at 10:13 a.m.  The defendant stated that he met the victim when they both worked at a produce stand.  He said the victim moved in with him and his father, and he and the victim began a sexual relationship.  He said that he suspected the victim of having sex with other men in his house while he was asleep and that the victim had told him she was sleeping with Tony Galvin, a neighbor.  He said the victim once told him that she was going to leave, and he told her that if he caught her living with another man, he would kill them both.  He said that a few weeks before the shooting, he asked the victim to set up Tony Galvin so he could "get him out of the way."  He stated that the night before the shooting, he suspected the victim of having sex with another man, and he checked between her legs to see if she had been having sex.  He admitted hitting the victim in the stomach and pinching her stomach, breasts, and ears.  He also admitted biting her several times.

In his statement, the defendant said that on the night of the shooting, he and the victim were

reading the Bible, and he told her that she was evil and was making him do evil things. He said that when he went outside to get the newspaper, he heard a gunshot and the sound of a gun hitting the floor. He said that when he returned, he saw that the victim had shot herself. He said his dad got out of bed, but he kept him from leaving. He said he did not want to call the police because they would suspect him of killing her and would put him in jail for life. He stated that he would "get rid of the body and then play the game with you all. I wanted time to take care of those guys that caused all these problems." He said he stapled plastic to the walls of his bedroom, carried the victim to the bedroom, and placed her on the plastic. The defendant stated that he made coffee, cleaned up the living room floor, and took apart the chair. He said that he eventually let his dad leave the house.

Agent Emiren testified that the chair in which the victim died had been in the living room, facing the television. He testified that the bullet hole in the wall shows that the bullet traveled at an upward angle.

Coeare Jenkinson testified that she lives in Michigan and had been friends with the victim for many years. She testified that the victim moved to Tennessee from Michigan in October 1994 to live with her father. She said she kept in contact with the victim during this time. She testified that the victim visited her in Michigan in the spring of 1995 and seemed very happy. She said she visited the victim in Tennessee in August for a week and stayed with the victim and the defendant. She said that when she was alone with the victim, the victim would be happy and talkative, but when the defendant was around, the victim was nervous. Ms. Jenkinson testified that the defendant had a handgun that he cleaned every day and kept with him at all times. She said that she never saw the victim touch a gun and that once, the defendant asked the victim to bring him his gun, but she refused. She said the defendant told her that the victim would not use the gun.

Ms. Jenkinson testified that the defendant and victim often argued and that the defendant accused the victim of cheating on him. She said the defendant once accused the victim of cheating on him with someone from Michigan when his phone bill revealed a telephone call to Michigan. She said the defendant stated that he was a "devil slayer" and that he could see the devil in the victim. Ms. Jenkinson said she asked the defendant if he was going to kill the victim, and the defendant replied that he had no reason to kill her at that time. She said he stated that he was not afraid to kill either her or the victim. She testified that if anyone pulled into the driveway, the victim would stay in the house. She said the victim was not allowed to go outside when someone visited and could not talk to other men.

Ms. Jenkinson testified that when the defendant was gone the next day, the victim told her she was afraid the defendant was going to kill her. Ms. Jenkinson testified that when she returned to Michigan, she called the victim three to four times each day. She said the defendant would answer, pretend to be his father, and say that the defendant and victim were out.

Ms. Jenkinson testified that the victim's parents divorced when the victim was around eleven or twelve. She stated that occasionally, the victim seemed depressed. She said that when she visited

the victim, she noticed that the victim had not been caring for her appearance as she had previously.

Dr. Charles Harlan, Chief Medical Examiner for Tennessee, testified that he performed an autopsy on the victim's body at 9:00 p.m. on December 8. He testified that the victim died from a contact gunshot wound that entered in the right temporal area of her head and exited in the left temporal area. He stated that the exit wound is about one-half inch higher than the entry wound. He testified that the victim had a cigarette burn and a partial bite mark on her left breast and that she had numerous brown-yellow and green bruises on both breasts that appeared to be four to five days old. He testified that the victim had similar bruises on her abdomen, scars or scabs on her left thigh, and a large bruise on the back of her right hand. Dr. Harlan testified that some of the bruises were consistent with the victim being punched. He said that no alcohol or drugs were detected in the victim. He testified that the victim had fatty liver disease which could be caused by alcohol abuse. He said the victim also had an inflamed thyroid gland which could affect one's emotional and psychological well-being.

Special Agent James Davis, II, a forensic scientist with the TBI Crime Laboratory, testified that he analyzed the gunshot residue tests performed on the defendant and the victim and that both were inconclusive. He said that he has previously test-fired guns like the one used in this case and that they typically leave gunshot residue when fired. He said he would generally expect the shooter to have residue on his or her hands and would also expect to find residue on the victim if he or she were close to the shooter. He noted that washing one's hands numerous times would affect the test results. He testified that he did not check the defendant's shirt for residue.

Agent Steve Scott, with the firearms identification section of the TBI Crime Laboratory, testified that he examined the .9 millimeter pistol, its magazine, the live ammunition recovered, one fired bullet, and one fired cartridge case. He said that if one imagined shooting the gun at the twelve o'clock position on a clock, the cartridge case would eject to about the three o'clock position, traveling four to five feet away from the gun. He testified that the cartridge case and bullet he analyzed were fired from the defendant's gun.

Tony Galvin testified that he lives across the road from the defendant. He stated that he had been to the defendant's house several times about two to three months before the shooting to make a car payment to the defendant's father. He said that he saw only the defendant's father and that he never saw a female when he was there. He said that on the night of the shooting, he got home from work late, fed his dogs and went to bed. He said that sometime after midnight, he heard a gunshot. He said he looked outside his window, did not see anything, and went to bed. He said he could not see the defendant's house from his bedroom window. He said that around 3:00 a.m., about fifteen or twenty minutes after the gunshot, he heard the defendant's father drive away.

The defendant testified that he met the victim when they worked together at a produce market. He said that eventually the victim moved in with him and that she was "up and down," sometimes happy, sometimes depressed. He testified that the victim had talked about suicide and that one night, she had a gun in her hand and said she considered shooting herself. He said he did not think she was serious.

-5-

The defendant testified that he suspected the victim of seeing other men and that he accused her of having sex with Tony Galvin and Jamie Goins. He said the thought of her bringing men into his house made him angry. He admitted that he hit the victim, slapped her on the head, and hit and punched her on the stomach and breasts. He said he pinched the victim's ears enough to become swollen. He admitted that he bit the victim. The defendant admitted telling the victim that if he caught her with another man, he would kill them both, and he admitted asking the victim to set up Tony Galvin so he could kill him.

The defendant testified that the victim had her own .32 caliber pistol but that he had hidden it from her in the coffee table. He said the victim had shot her pistol before and had cocked his .9 millimeter gun. He testified that on the night of the shooting, he returned from getting the paper to find the victim sitting toward the television with her right leg underneath her and his gun by her left foot. He said he did not think to summon help because she was dead. He said his father told him to call the police, but he told his father to go back to bed. He said that for the next hour, he just stood around. He said he then went to his father's bedroom, and his father asked him if he shot the victim. He said he told his father that she shot herself. He said he did not want to let his father go to the police because he was concerned about his father's driving. He agreed that he let his father leave only because his father promised that he would go to his daughter's house and would not tell her what happened.

The defendant testified that he read the notes Chief Deputy Byrd made after talking with him but that he was not allowed to correct them. He said the notes were fairly accurate. He admitted that he was convicted of robbery, served time in jail, and was released in 1992. He denied shooting the victim.

Luther Dotson, Sr., the defendant's father, testified that the defendant and the victim seemed to get along well. He said that on the evening of the shooting, the defendant appeared normal and was not angry. Mr. Dotson testified that he went to bed around 10:00 p.m. and that his bed is against a window at the front of the house. He said that looking out his window, one can see the front yard and the mailbox. He testified that he was awakened by a gunshot around 2:00 a.m. He said he stayed in bed for a few seconds, then raised up and looked out the window. He said he saw the defendant walking toward the house from the mailbox. He said he lay back down then went to his bedroom door. He said the defendant told him that everything was fine. He said that from his door, he could see the back of the victim and that she was sitting in a chair in the living room facing the kitchen. He said he went back to his room, and the defendant came back and said the victim had shot herself. He testified that the defendant told him not to call the authorities because they would think the defendant had shot the victim. He said he did not call the police because he was afraid the defendant would harm himself. He said the defendant never prevented him from leaving. He

testified that when he left, he told the defendant he was going to his daughter's house but that he immediately went to the sheriff's department.

Mr. Dotson said he did not remember testifying at the preliminary hearing that he had never seen the victim shoot a gun. He said he never saw the defendant abuse the victim and never heard

her scream. He said the defendant and victim were always happy and were inseparable. He said that after the shooting, he might have told someone at the sheriff's department that if the defendant shot the victim, the defendant had plenty of time to get outside before he (Mr. Dotson) looked out his window. Mr. Dotson denied asking the defendant if he shot the victim. He admitted that when he went to the sheriff's department, he gave a statement in which he said he did ask the defendant if he shot the victim, but he said he just wanted the officer to leave and to check on the defendant. Mr. Dotson denied saying that he was afraid of the defendant. He said that his memory was better now than it was immediately after the shooting because he was upset then. He identified a sworn statement that he gave to Agent Emiren in which he said that he tried to call the police from his house but that the defendant continually checked on him.

Tiffany May testified that she is sixteen and that the defendant is a friend of her stepfather. She testified that sometimes the victim would come to her house with the defendant. She stated that the victim once said that when she was upset, she felt like hurting herself. She said she did not know if the victim was referring to when the victim lived in Michigan with her mother. She said the victim never seemed afraid of the defendant. Ms. May's sister, Stephanie, testified that when the victim talked about hurting herself, she was referring to the time when she lived with her mother.

Dr. Rodney Fowler testified that he is a professor at The University of Tennessee at Chattanooga and is a licensed professional counselor. He testified that he teaches a graduate course called Crisis Counsel and Suicidology. He testified that people who attempt or commit suicide generally have three common traits: (1) inimicality, in which the person feels friendless and full of self-hate; (2) constriction, in which the person is very focused on their own problems; and (3) perturbation, in which the person faces unendurable psychological pain that they cannot escape. Dr. Fowler testified that the person must then have a triggering device to make them want to commit suicide.

Dr. Fowler testified that if someone has already died, he can conduct a "psychological autopsy" to determine if the individual possessed suicide risk factors. Dr. Fowler stated that the following were risk factors: depression, low self-esteem, preoccupation with death, withdrawal, frequent in-depth discussions of suicide, alcohol use, and personal loss. He testified that people who are depressed often do not take care of their appearance. He also testified that promiscuity and tattooing are forms of self-punishment and self-injury.

Dr. Fowler testified that he spoke with the defendant, the defendant's sister, Stephanie May, Tiffany May, and Tina Dotson. He said that he learned from these people that the victim exhibited some of the aforementioned risk factors. He said the victim's parents had divorced, and she had an unhappy family situation. He said she had stopped taking care of her appearance, was isolated, had tattoos, and thought of killing herself when she became angry. He testified that she was at risk for suicide.

Dr. Fowler admitted that suicidology is a new field and that no state licensing or regulation exists. He said that he only spoke briefly with the people he interviewed and that he had no way of knowing if they were telling the truth. He said he did not read the defendant's statements and did

not interview the defendant's father. He said he was not informed that the victim was smiling and acting normally a few hours before her death.

Thomas Dobson, a land surveyor, testified that he interviewed the defendant's father regarding the layout of the house on December 8. He said Mr. Dotson showed him the location of the bullet hole in the wall and explained how the furniture in the living room and storage room had been arranged at the time of the shooting. Mr. Dobson said that based on his projections, the bullet hole in the wall was located four feet, nine inches from the ground, and the chair in which the victim had been sitting when she was shot was two feet, nine inches from the ground. He acknowledged that the actual chair in which the victim had been sitting was not at the Dotson house when he made his calculations. He stated he had to use a different chair that Mr. Dotson provided as a replacement. Mr. Dobson said he was told that the chairs were very similar. He admitted that he relied upon Mr. Dotson's placement of the chair in the living room and the lampshade in the storage room and that if the objects were a few inches off, this could slightly throw off his conclusions.

The state and the defendant stipulated that the newspaper carrier would testify that he generally delivered the defendant's paper between 1:30 and 2:00 a.m. Based upon the foregoing proof, the jury convicted the defendant of first degree murder.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction, asserting that the state failed to prove premeditation and deliberation. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Initially, the defendant argues that the state was required to prove deliberation. Before July 1, 1995, first degree murder was defined as the intentional, premeditated and deliberate killing of another. Tenn. Code Ann. § 39-13-202(a)(1) (amended 1995). The statute was amended, effective July 1, 1995, to remove the element of deliberation. Tenn. Code Ann. § 39-13-202(a)(1) (1996). The offense in the present case occurred in December 1995. Thus, the state was not required to prove deliberation, and the trial court did not instruct the jury on the separate element of deliberation. However, the indictment charged the defendant with the intentional, premeditated and deliberate killing of the victim, and the defendant contends that the state was required to prove deliberation because it was included in the indictment.

This court addressed a similar issue in State v. Hopper, 695 S.W.2d 530, 535 (Tenn. Crim. App. 1985). In that case, the defendant was convicted of felony murder upon an indictment alleging

that the killing was done "wilfully, deliberately and maliciously" during the perpetration of a robbery. Id. The defendant argued that although a felony murder conviction does not require proof of deliberation, the state was required to prove that element, having alleged it in the indictment. The court disagreed, holding that the allegation of deliberation "was mere surplusage and could not have misled the defendant in any manner." Id. We believe that the same is true in the instant case. We further note that our criminal code provides that defendants "shall be prosecuted under the act or statute in effect at the time of the commission of the offense." Tenn. Code Ann. § 39-11-112. Under the statute in effect at the time of the offense in the present case, the state need not prove deliberation.[1]

The defendant contends that the evidence is insufficient to support his conviction for first degree murder because the state failed to prove premeditation. A premeditated act is one "done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). Furthermore, the element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

Viewing the evidence in the light most favorable to the state, we believe that the evidence is sufficient to support a finding that the defendant shot the victim with premeditation. First, the victim was unarmed when the defendant shot her. Second, the evidence showed that the defendant had made statements indicating an intent to kill the victim. The defendant admitted that he threatened to kill the victim if she went to live with someone else, and the evidence showed that the victim was growing increasingly angry with the victim because he believed she was cheating on him. Ms. Jenkinson testified that the defendant stated that he was not afraid to kill the victim. The evidence further shows that the defendant displayed calmness immediately after the killing. He picked up the gun, wiped it off, told his father everything was fine, moved the victim to his bedroom and placed her on plastic, made coffee, and continued to clean up the scene. These circumstances are sufficient to support a finding beyond a reasonable doubt that the defendant acted with premeditation.

## II. EX PARTE HEARING

The defendant contends that the trial court erred by refusing to grant an ex parte hearing on his motion for resources to hire an expert on suicide. He argues that Rule 13, Tenn. Sup. Ct. R., requires an ex parte hearing and that by denying one, the trial court prejudiced him by alerting the

---

[1]We note that even though the state was not required to prove the distinct element of deliberation, the trial court's instruction to the jury that a premeditated act is one done after the exercise of reflection and judgment encompasses the general concept of deliberation as set forth in prior case law. See State v. Brown, 836 S.W.2d 530, 539, 543 (Tenn. 1992).

state to his defense. The state contends that ex parte hearings are only necessary when the defendant's mental state is likely to be significant to his defense. See State v. Barnett, 909 S.W.2d 423, 428 (Tenn. 1995). Thus, it argues that the trial court properly denied the defendant's request because he was not seeking funds to hire an expert to evaluate his mental state. The state further contends that the hearing did not alert the state to the defendant's defense because the defendant had always maintained that the victim committed suicide.

> Rule 13, section 5(a), Tenn. Sup. Ct. R., provides, in pertinent part, as follows:
> In the trial and direct appeals of all criminal cases in which the defendant is entitled to appointed counsel and in the trial and appeals of post-conviction proceedings in capital cases, the court in an ex parte hearing may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

(Emphasis added). The plain language of the rule provides that an ex parte hearing with respect to a request for investigative or expert services is mandatory. Furthermore, the rule does not limit the hearing to those requests relative to a defendant's mental state. Rule 13 became effective on July 1, 1997, after Barnett. Thus, the state's reliance on Barnett as a limitation on ex parte hearings is misplaced. The rule plainly requires an ex parte hearing, and the trial court erred by not granting one to the defendant.

Nevertheless, we believe the error to be harmless. Tenn. R. Crim. P. 52(a). Since the defendant was taken into custody, he has maintained that the victim shot herself. Furthermore, the state would have been entitled to discover the defendant's expert and any documents or tangible objects and any results or reports of examinations or tests performed by the expert. Tenn. R. Crim. P. 16(b)(1). Thus, the defendant has not demonstrated that the state gained any unfair advantage from the trial court's denial of an ex parte hearing.

### III. LIMITATION OF EXPERT'S TESTIMONY

The defendant contends that the trial court erred by not allowing Dr. Fowler to testify that the victim had told others that she had previously attempted suicide. He contends that the evidence was admissible pursuant to Rule 703, Tenn. R. Evid., as a basis for Dr. Fowler's opinion. The state contends that the trial court properly excluded the evidence because of the possibility of misleading the jury. Tenn. R. Evid. 403.

The defendant sought to allow Dr. Fowler to testify that the defendant, his sister, the victim's half-sister, and the May sisters told him that the victim had spoken of previous suicide attempts. In an offer of proof, Dr. Fowler testified that regardless of whether or not the victim had actually attempted suicide before, the fact that she made the statements was an important risk factor for suicide. The trial court held that the evidence was inadmissible, finding as follows:

> The probative value is, is that it's a basis or one of the bases for his expert opinion. There are other pieces of evidence upon which he could base his expert opinion. I think there's a high risk that the jury will misuse that evidence and that it may mislead the jury into accepting the statement as true. Now, I understand that the

defense says we're not offering it for its truth, but I think there's a high probability that the jury will use it for its truth and secondly, I think it has . . . little probative value, so based on 403 analysis I'm going to keep that testimony out.

Rule 703, Tenn. R. Evid., provides as follows:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate a lack of trustworthiness.

According to the Advisory Commission Comment, "[i]f the bases of expert testimony are not independently admissible, the trial judge should either prohibit the jury from hearing the foundation testimony or should deliver a cautionary instruction. Unfairly prejudicial facts or data should be dealt with under Rule 403."

We believe that the trial court erred by not allowing Dr. Fowler's testimony. Dr. Fowler's ultimate opinion that the victim was at risk for suicide was based upon several factors. It was important for the jurors to know those factors to assist them in evaluating the credibility of Dr. Fowler's opinion. See, e.g., People v. Anderson, 495 N.E. 2d 485, 488-89 (Ill. 1986) ("Inasmuch as the opinion based on . . . materials – which are deemed trustworthy by the profession – is allowed, it would be both illogical and anomalous to deprive the jury of the reasons supporting that opinion). According to Dr. Fowler, a "very important" factor in assessing the victim's risk involved the victim's previously stating that she had attempted suicide, regardless of whether she actually had. Dr. Fowler's reliance upon the factor as very important in assessing the victim's risk necessarily shows that the evidence is highly probative. Nevertheless, the trial court determined that the evidence was of low probative value. In light of the expert's testimony regarding the importance of the evidence in assessing the victim's risk, we do not believe the trial court's finding to be supported by the record. Also, any danger of concern to the trial court regarding misleading the jury could have been avoided with a cautionary instruction that the testimony was not to be considered for its truth but rather as a basis for Dr. Fowler's opinion. See Baggett v. State, 220 Tenn. 592, 598, 421 S.W. 2d 629, 632 (1967) (holding that although trial courts generally enjoy discretion regarding the admissibility of evidence, such discretion is not absolute and may be overturned on appeal if arbitrarily exercised); see also Tenn. R. Evid. 703, Advisory Comm'n Comments; Benson v. Tennessee Valley Elec. Coop., 868 S.W.2d 630, 641 (Tenn. Ct. App. 1993). In this respect, we believe that no material basis exists in the record to justify excluding the evidence under Rule 403, Tenn. R. Evid.

Nevertheless, we believe that the error was harmless. The expert witness was allowed to testify concerning a significant number of facts and data upon which he based his opinion that the victim was a high risk for suicide, including facts that reflected upon the crucial issue of the victim's state of mind. For example, Dr. Fowler testified that the victim engaged in "self-injurious" behavior, that she spoke of wanting to commit suicide, and that "when she got mad she thought about killing

herself." Under these circumstances, the trial court's error does not affirmatively appear to have affected the result of the trial on the merits. See Tenn. R. Crim. P. 52(a). Considering the whole record, we cannot say that the error more probably than not affected the judgment in this case. See T.R.A.P. 36(b).

### IV. JURY INSTRUCTION ON CIRCUMSTANTIAL EVIDENCE

The defendant contends that the trial court erred by denying his requested instruction on circumstantial evidence and by giving an improper instruction. The state contends that the trial court's instruction was proper. Initially, we note that in criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies the defendant his constitutional right to a trial by jury. See State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1997). However, a special instruction need not be given when its substance is already covered in the general charge. See Edwards v. State, 540 S.W.2d 641, 649 (Tenn. 1976).

The defendant requested the following jury instruction with respect to circumstantial evidence:

Before an accused may be convicted of a criminal offense based exclusively upon circumstantial evidence, the evidence must be so strong and cogent as to exclude every other reasonable hypothesis except the guilt of the defendant. In other words a web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference except the guilt of the defendant beyond a reasonable doubt.

The trial court denied the defendant's special request and, after instructing the jury on direct evidence, further instructed the jury as follows:

Circumstantial evidence is all the testimony and exhibits which give you clues about what happened in an indirect way. It consists of all the evidence which is not direct evidence. For example, if a witness testified that the witness [s]aw it raining outside, that would be direct evidence that it was raining. If a witness testified that the witness saw someone enter a room wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

According to our laws, direct evidence is not necessarily better than circumstantial evidence. Each type of evidence can prove a fact if it is convincing enough. A defendant may be convicted on direct evidence, circumstantial evidence or both. When the evidence is entirely circumstantial, then before you would be justified in finding the defendant guilty, you must find that all the essential facts are consistent with the theory of guilt, and the facts must exclude every other reasonable theory except that of guilt.

First, we do not believe that the trial court erred by denying the defendant's special request. The trial court's instruction that the facts must be consistent with the theory of guilt and must

exclude every other reasonable theory except that of guilt embraces the concepts in the defendant's proposed instruction and is a correct statement of the law.  See State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987).

Furthermore, we do not believe that the trial court erred by providing the "wet umbrella" example.  The defendant argues that this example is too extreme and "overstates the importance of circumstantial evidence."  We disagree.  The "wet umbrella" example does not place any extraordinary importance upon circumstantial evidence.  In fact, the trial court specifically instructed the jury that it could convict the defendant on direct evidence, circumstantial evidence, or both.  Furthermore, the trial court had already instructed the jury that the state must prove the defendant's guilt beyond a reasonable doubt.  We believe that the "wet umbrella" example was not a comment on the importance of circumstantial evidence but merely aided the jury in understanding the difference between direct and circumstantial evidence.

In consideration of the foregoing and the record as a whole, we affirm the judgment of conviction.