THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TED WILLIAMS, Defendant-Appellant.

First District (1st Division)   No. 1—86—2714

Opinion filed June 29, 1990.—Rehearing denied January 4, 1991.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Kathleen F. Howlett, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MANNING delivered the opinion of the court:

The defendant, Ted Williams, was charged by indictment with the attempted rape (Ill. Rev. Stat. 1983, ch. 38, par. 8—4), and murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)), of his 12-year-old niece, Sharon McCambry. His defense was insanity. A fitness hearing was held before a six-person jury to determine defendant's fitness for trial. The jury determined that the defendant was fit for trial. After a jury trial on the charges, he was convicted of both offenses and sentenced to a term of natural life imprisonment.

Defendant contends on appeal that the court committed reversible error by ordering *sua sponte* a six-man jury to determine his fitness to stand trial. He further contends that he was denied his constitutional right to a fair and impartial trial because the trial court re-

stricted his efforts to present an insanity defense, and erred in its evidentiary rulings, its conduct and comments as well as by the prosecutor's closing arguments.

The evidence presented during the trial revealed that, on February 12, 1984, the defendant's live-in girlfriend, Annette Cathey, took their daughter and moved back home with her mother. That same day, the defendant unsuccessfully attempted to visit his mother, Mattie, at 4555 South State Street. He then proceeded to the residence of Yvonne McCambry, his sister, and the mother of Sharon McCambry (victim). His sister was not at home; however, the victim was there and she subsequently left with the defendant, presumably to go to her grandmother Mattie's house. Instead, the defendant took the victim to his house, began to drink liquor that he had purchased en route to his house, smoked some hashish and made sexual advances to the victim. When the victim resisted his sexual advances, the defendant struck her in the head with a hammer. The defendant then disposed of some of the evidence in a dumpster on 35th Street and left the victim's body near her home in the vicinity of around 43rd and Federal.

The victim's body was discovered the next day by Robert Wonsley, a neighbor, who resided at 4331 Federal. Mr. Wonsley testified that he saw a bundle of bedding that was covered with blood. The police were called immediately, and upon their arrival, determined that a body dressed only in a sweatshirt and socks was inside the bundle of bedding. Upon hearing that a body had been found, the victim's mother, Yvonne McCambry, ran down the stairs and identified the body as her missing daughter, Sharon.

Wendy Walker, the victim's best friend, and Leon Williams, the defendant's nephew, testified that on February 12, 1984, they saw the victim and the defendant leave together. The testimony from other witnesses also revealed that bloodstains were found in the defendant's car and apartment and there were recently cut holes in the carpet. The testimony further revealed that paint chips found on the murder weapon, the bedding, the victim's clothing, and the defendant's apartment were from a common origin. Annette Cathey also identified the blankets, sheets and towels which were covered with blood and dirt as items from the apartment which she previously shared with the defendant. Annette further testified that subsequent to the defendant's arrest, he told her that he had hurt his niece and explained the sequence of events that occurred in great detail, beginning with getting high, touching the victim's breast, the struggle between them which led to his striking her with a hammer, and ending with the disposal of the victim's body and his return to the apartment. Annette

also testified that several months prior to the murder of the victim, the defendant had killed their cat and threatened to do the same thing to Annette.

An autopsy performed on the victim showed extensive head injuries consistent with being struck in the head with a hammer. It further revealed injuries to the victim's lips, abrasions on her chin, discoloration of her right cheek, scratches on her neck, bruises on her wrists and contusion to the vaginal opening. Also, during the trial, the State published a statement given by the defendant to the assistant State's Attorney on the evening of his arrest. The defendant told the assistant State's Attorney exactly how he killed the victim and how he disposed of the hammer, clothing, and pieces of carpeting in a dumpster on 35th Street and then took the victim's body wrapped in bedding and left it near some railroad tracks at 43rd and Federal.

During the trial, the defendant presented the testimony of three expert witnesses to support his insanity defense, Doctors Henry Conroe, Louis Hemmerich and Alan Rosenwald. Dr. Hemmerich diagnosed the defendant as being borderline mentally defective suffering from borderline personality disorders with anti-social features and schizoid personality disorders resulting in episodic psychosis. In his opinion, as a result of the mental disease or defect, the defendant was unable to appreciate the criminality of his act or conform his conduct to the requirements of the law.

Dr. Conroe, a psychiatrist and assistant professor of psychiatry at the University of Chicago, testified that he examined the defendant on September 9, 1985. After reviewing police reports, the reports of Drs. Rosenwald and Hemmerich and reports from the Psychiatric Institute, he learned that the defendant's mother had been institutionalized on several occasions at mental hospitals, that his sister had a history of hospitalizations for psychosis, and that the defendant's father was a very sadistic man who had beaten the defendant and other family members and had allegedly raped two of the defendant's sisters. Dr. Conroe further learned that the defendant had a history of alcohol and drug use. Based upon his review of the reports and his personal examination, he concluded that the defendant had a borderline personality disorder with the "capacity to go over into psychosis," and when he attacked the victim, he lacked the capacity to conform his conduct to the requirements of the law. He did, however, testify that the defendant understood the criminality of his actions when the murder was committed.

Dr. Rosenwald examined the defendant in September 1984 and found the defendant clinically and legally insane based solely on the

tests that he had administered. However, he stated that he did not ask the defendant any questions regarding the details of what took place on February 12, 1984. Dr. Rosenwald further testified that although the defendant could not conform his conduct to the requirements of the law, he might simultaneously appreciate the criminality of his act.

In rebuttal, the State called Dr. Albert Stipes and Dr. Gilbert Bogen, two psychiatrists from the Cook County Psychiatric Institute. Dr. Stipes testified that he examined the defendant on March 30, 1984, and his evaluation revealed that the defendant suffered from three disorders: (1) adjustment disorder with depressed mood; (2) intermittent explosive disorder; and (3) anti-social personality disorder. However, these disorders were not mental diseases or defects. Dr. Stipes stated that his examination of the defendant revealed no evidence of schizophrenia, hallucinations or any psychosis and when the incident occurred, the defendant did not exhibit any delusional thinking. Dr. Stipes further concluded that based on his interview with the defendant, psychological reports, the social history, and medical reports, on the date that the defendant struck the deceased he was able to conform his conduct to the requirements of the law and the defendant was legally sane at the time the offense was committed.

Dr. Bogen testified that the defendant's behavior prior to and immediately after the incident was logical, understandable, deliberate and purposeful. Dr. Bogan also testified that the defendant suffers from five types of personality disorders and mental illness or defects. Furthermore, he opined that the defendant is able to conform his conduct to the law and appreciate the criminality of the offense and, based on the evidence, concluded that the defendant was sane at the time of the offense.

The jury found the defendant guilty of murder and attempted rape. However, it rejected the death penalty, and the court sentenced the defendant to natural life in the Illinois Department of Corrections. On appeal, we are called upon to determine whether reversible error occurred in connection with and during the defendant's pretrial fitness hearing and whether the defendant was denied his constitutional right to a fair and impartial trial.

■■ ■ The defendant initially contends that reversible error was committed at the pretrial fitness hearing when the trial court *sua sponte* ordered that the jury for the defendant's fitness hearing would consist of six persons. Defendant further contends that the fitness hearing was unfair and improperly conducted. Generally, in a criminal trial an accused is entitled to a 12-person jury. However, a fitness

hearing is not a part of the trial on the criminal charges against the defendant. (*People v. Rosochacki* (1969), 41 Ill. 2d 483, 489-90, 244 N.E.2d 136; *People v. McCullum* (1977), 66 Ill. 2d 306, 312, 362 N.E.2d 307.) Instead, a fitness hearing is a preliminary civil proceeding separately conducted to determine an accused's competency to stand trial. *People v. Williams* (1970), 131 Ill. App. 2d 507, 508, 266 N.E.2d 145; *Rosochacki*, 41 Ill. 2d at 489.

■■ The sole purpose of a pretrial fitness hearing is to determine whether the defendant can understand the nature of the proceedings and can participate in his own defense at trial. (Ill. Rev. Stat. 1987, ch. 38, par. 104—10; *Pate v. Robinson* (1966), 383 U.S. 375, 378, 15 L. Ed. 2d 815, 818, 86 S. Ct. 836, 838; *People v. Lang* (1986), 113 Ill. 2d 407, 440, 498 N.E.2d 1105.) If the defendant is unable to understand the nature of the proceedings against him or to assist his counsel in the preparation of his defense, then he is unfit to stand trial. *People v. Wright* (1988), 171 Ill. App. 3d 573, 580, 525 N.E.2d 1165; *People v. Turner* (1982), 111 Ill. App. 3d 358, 361, 443 N.E.2d 1167.

The dichotomy between the panel of 12 jurors versus six jurors was addressed by the United States Supreme Court in *Williams v. Florida* (1970), 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893. In that case, the Court denied petitioner's pretrial motion requesting a 12-person jury rather than a six-person jury. The Supreme Court held that the six-member jury did not violate the constitutional guarantee of trial by jury. (*Williams*, 399 U.S. at 86, 26 L. Ed. 2d at 452-53, 90 S. Ct. at 1898.) Moreover, although the size of the jury at common law generally was fixed at 12, "that particular feature of the jury system appears to have been a historical accident, unrelated to the great purposes which gave rise to the jury in the first place." (*Williams*, 399 U.S. at 89-90, 26 L. Ed. 2d at 454, 90 S. Ct. at 1900.) The *Williams* Court further reasoned that the number should be large enough to obtain a representative cross-section of the community and there is no reason why this cannot be achieved as reliably when the jury numbers six than when it numbers 12, especially if the unanimity requirement is retained. *Williams*, 399 U.S. at 100, 26 L. Ed. 2d at 460, 90 S. Ct. at 1906.

■ The Supreme Court reaffirmed its conclusion reached in *Williams* relative to civil cases in *Colgrove v. Battin* (1973), 413 U.S. 149, 151-52, 37 L. Ed. 2d 522, 526, 93 S. Ct. 2448, 2450. The *Colgrove* Court determined that the purpose of the jury trial is to assure a fair and equitable resolution of factual issues. (*Colgrove*, 413 U.S. at 157, 37 L. Ed. 2d at 529, 93 S. Ct. at 2453.) Therefore, "it cannot be said that 12 members is a substantive aspect of the right of trial by jury."

(*Colgrove*, 413 U.S. at 157, 37 L. Ed. 2d at 529, 93 S. Ct. at 2453.) We, therefore, conclude that a jury of six satisfies the constitutional guarantees in both criminal and civil cases. (See *Williams*, 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893; *Colgrove*, 413 U.S. at 160, 37 L. Ed. 2d at 530-31, 93 S. Ct. at 2454.) Accordingly, in light of our United States Supreme Court decisions on this issue and upon our review of the entire record, we conclude that in the present case the trial court properly ordered a six-man jury to determine the defendant's fitness to stand trial. If any error occurred as to the court's own motion to impanel a jury of six persons, the error was harmless beyond a reasonable doubt. See *United States v. Hasting* (1983), 461 U.S. 499, 510-11, 76 L. Ed. 2d 96, 107, 103 S. Ct. 1974, 1981; *Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828; *People v. Arman* (1989), 131 Ill. 2d 115, 127, 545 N.E.2d 658.

■ Defendant next argues that reversible error also occurred at the fitness hearing when Dr. Bogan, the State's psychiatrist, testified to the defendant's propensities for violence. The record reveals that Dr. Bogan submitted a report of his findings upon which he based his opinion. Defendant correctly argues that Dr. Bogan summarized the defendant's personality disorders in laymen's terms as being "mean, ornery, very mean, sometimes vicious." However, although an expert may express an opinion regarding the defendant's fitness, the ultimate issue is for the trial court to decide based on the factual basis for the expert's opinion. (*People v. Bleitner* (1989), 189 Ill. App. 3d 971, 976, 546 N.E.2d 241.) Moreover, it is the responsibility of the trier of fact to determine the credibility of an expert and the weight to be given the psychiatric testimony in a fitness hearing. (*People v. Bilyew* (1978), 73 Ill. 2d 294, 302, 383 N.E.2d 212.) It is well established that a court of review will not substitute its judgment for that of the trial court absent an abuse of discretion. (*People v. Branson* (1984), 131 Ill. App. 3d 280, 289-90, 475 N.E.2d 905; *Turner*, 111 Ill. App. 3d at 366; *Wright*, 171 Ill. App. 3d at 580.) Since we find no abuse of the trial court's discretion in the instant case, we will not substitute our judgment for that of the trial court.

The defendant next contends that he was denied his constitutional right to a fair and impartial trial. Specifically, he contends that the trial court restricted his efforts to present an insanity defense and erred in its evidentiary rulings. Defendant argues that he was precluded from presenting expert and lay testimony on: (1) the defendant's family history of insanity; and (2) the physical and sexual abuse to which defendant and his siblings were subjected by defendant's fa-

ther. Furthermore, defendant asserts that the court erroneously granted the State's motion *in limine* barring the admission of medical records. Defendant further argues that although Dr. Hemmerich, a clinical psychologist, testified that the defendant was a "borderline personality" and that the killing of his niece with a hammer was a "transient psychotic episode," the trial court precluded Dr. Hemmerich from testifying to facts pertaining to the defendant's suicide attempts in jail and other facts pertaining to the defendant's family history in support of his diagnosis. Additionally, the trial court precluded the defendant's mother from testifying regarding the mental problems of other family members, and the defendant's brother, Oliver Williams, was barred from testifying about the interparental violence in the defendant's home and the physical and sexual abuse his father administered to defendant and his siblings.

The State argues that the trial court properly restricted testimony regarding the defendant's family history since it was collateral testimony and not probative as to whether the defendant was able to appreciate the criminality of his conduct at the time he murdered his 12-year-old niece. The record reveals that Dr. Hemmerich was allowed to testify regarding his personal clinical interview with the defendant, the testing performed and the information received therefrom. Moreover, Dr. Conroe, another expert testifying on behalf of the defendant, provided testimony regarding hospitalizations of defendant's mother and sister for mental illness, the alleged rape of the two sisters by the father and the sadistic nature of the defendant's father. Dr. Conroe further testified that the defendant grew up in foster homes and experienced behavior problems as a child. Therefore, the probative evidence regarding the defendant's family history was put before the jury and additional testimony would have been cumulative.

██ █ We acknowledge that a psychiatrist should be allowed to testify regarding the contents of the materials relied on by him in explaining the basis of his opinion, including statements of the defendant that were used to support his opinion. (See *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485; *People v. Murphy* (1986), 147 Ill. App. 3d 122, 125, 497 N.E.2d 871.) However, we have previously held that the defendant is not prejudiced by the rejection of evidence where the same or substantially the same evidence that has been excluded is admitted elsewhere in the trial. (*People v. Hoddenbach* (1983), 116 Ill. App. 3d 57, 61, 452 N.E.2d 32.) While it could have been error for the trial court to restrict the testimony of Dr. Hemmerich, if any error occurred, we would deem it to be harmless since the information he sought to adduce was presented to the jury

through the testimony of other witnesses. Therefore, we cannot conclude that the defendant was denied his right to a fair and impartial trial as a result of any restrictions placed on Dr. Hemmerich's testimony.

Defendant also argues that the trial court erroneously granted the State's motion *in limine* disallowing certain medical records. *In limine* motions are encouraged in criminal cases to exclude extraneous or collateral matters. (*People v. Downey* (1987), 162 Ill. App. 3d 322, 334, 515 N.E.2d 362; *People v. Clark* (1984), 129 Ill. App. 3d 374, 377, 472 N.E.2d 814.) A court of review will not reverse a trial court's decision to grant or deny a motion *in limine* absent an abuse of discretion. (*Downey*, 162 Ill. App. 3d at 334; *People v. Williams* (1978), 60 Ill. App. 3d 529, 532, 377 N.E.2d 367.) It is well settled that the testimony of a psychiatrist regarding the defendant's sanity may be based on medical or psychological reports that have been prepared by others even when those reports are not admitted into evidence as long as experts in the field rely on such materials. (*Anderson*, 113 Ill. 2d at 7; *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322; *People v. Ward* (1975), 61 Ill. 2d 559, 568, 338 N.E.2d 171; *Murphy*, 147 Ill. App. 3d at 125.) Moreover, the *People v. Anderson* court took "judicial notice that psychiatrists customarily rely upon other psychiatric and investigative reports." (*Anderson*, 113 Ill. 2d at 8.) However, in the present case, sufficient evidence was presented through expert testimony to provide the jury with a factual basis to determine whether the defendant did appreciate the criminality of his conduct and whether he could conform his conduct to the requirements of the law when he murdered his 12-year-old niece. Thus, we can not find an abuse of discretion in granting the motion *in limine*.

Defendant further contends that his insanity defense was prejudiced by the court's conduct and comments by the court as well as by the prosecutor's closing arguments. Specifically, he alleges that the trial court lost its impartiality towards the defense and defense counsel in the presence of the jury. The State counters the defendant's argument by arguing that the trial court also displayed a partiality towards the defense by assisting the defense in laying a foundation to qualify Dr. Conroe as an expert witness. Moreover, the State contends the trial court interposed and sustained an objection on behalf of the defendant to an improper question asked of the defendant's expert witness although the defense counsel had not made such an objection. Finally, the State asserts that during a sidebar, the trial court provided guidance to defense counsel regarding the proper form of questions for eliciting an expert opinion.

■■ Defendant further alleges that the court refused to allow the defense to rehabilitate Dr. Henry Conroe when he stated that he generally testified for the defense on sanity and fitness issues and each time opined that the defendant was insane. It is within the sound discretion of the trial court to determine whether inquiry for rehabilitative purposes is proper. (*People v. Moore* (1980), 92 Ill. App. 3d 71, 73-74, 414 N.E.2d 274; *People v. Burke* (1964), 52 Ill. App. 2d 159, 201 N.E.2d 636.) In the present case, the court's conduct revealed that it did not deem it proper to allow rehabilitation of Dr. Conroe's testimony. Dr. Conroe's testimony revealed that he had testified approximately 25 times in criminal insanity cases. He also stated that each time he testified it was for the defense and on each occasion he concluded that the defendant was insane at the time of the offense. When the State objected to the question regarding the number of times Dr. Conroe conducted assessments of criminal defendants, the trial court allowed Dr. Conroe to answer. However, when defense counsel attempted to elicit from Dr. Conroe his reasons for not testifying in those other cases, the court disallowed that line of questioning since neither the results of those examinations nor the bases for those examinations were matters pending before the court nor did they have a bearing on the matter before the court.

■■ Based on the facts presented, we cannot find an abuse of discretion by the trial court's limiting the rehabilitation of Dr. Conroe where his additional testimony concerned collateral facts. (See *Moore*, 92 Ill. App. 3d 71, 414 N.E.2d 274.) Moreover, although the facts presented by Dr. Conroe had a tendency to show bias, those facts would have remained the same notwithstanding the allowance of collateral facts. We have previously held that the rehabilitation of a witness who has been shown to be biased on cross-examination will not be allowed on redirect examination where the reasons for the bias do not have a tendency to rehabilitate the witness. (See *Burke*, 52 Ill. App. 2d at 161.) Upon a review of the entire record, we conclude that if any error occurred as a result of the trial court's comments or conduct, the errors were harmless and did not deprive the defendant of his right to a fair trial. See *Hasting*, 461 U.S. at 510, 76 L. Ed. 2d at 107, 103 S. Ct. at 1981; *Chapman*, 386 U.S. at 24, 17 L. Ed. 2d at 710-11, 87 S. Ct. at 828; *Arman*, 131 Ill. 2d at 127.

■■ ■ Defendant further contends that his insanity defense was prejudiced by the prosecutor's closing arguments. He supports this contention by asserting that: (1) the prosecutor referred to the State's experts as "independent" and the defense experts as "hired"; (2) the prosecutor dismissed the defendant's expert testimony as "garbage";

(3) the prosecutor concluded that the insanity defense was a last resort effort since no other defense was available; and (4) the prosecutor attempted to shift the jury's concern from the insanity defense to sympathy for the victim. The defendant's argument lacks merit. The scope of argument to the jury is within the discretion of the trial court and every reasonable presumption must be indulged in that the trial court properly exercised that discretion. (*People v. Harris* (1989), 132 Ill. 2d 366, 391, 547 N.E.2d 1241; *People v. Shum* (1987), 117 Ill. 2d 317, 351, 512 N.E.2d 1183, *cert. denied* (1988), 484 U.S. 1079, 98 L. Ed. 2d 1022, 108 S. Ct. 1060.) Moreover, a prosecutor has wide latitude during closing argument to comment on the evidence presented, and the trial court's determination regarding the propriety of the closing argument will not be reversed on appeal absent a clear abuse of discretion. *Shum*, 117 Ill. 2d at 341; *People v. White* (1989), 181 Ill. App. 3d 798, 806, 537 N.E.2d 1315; *People v. Richard* (1980), 88 Ill. App. 3d 247, 410 N.E.2d 459.

During closing argument the prosecutor stated that the defendant saw Dr. Grossman and Dr. Stipes shortly after the incident, who were independent doctors not paid for by the defense or the State. The prosecutor further stated that the defense hired a series of doctors, *i.e.*, Dr. Rosenwald, Dr. Hemmerich and Dr. Conroe. Drs. Hemmerich and Conroe disagreed with the findings of Dr. Rosenwald and agreed with the conclusions of the State's experts that there was no evidence of schizophrenia. The record does reveal that the prosecutor did refer to the defense expert's testimony as "garbage" when Dr. Hemmerich during his testimony expanded on the report that he completed shortly after examining the defendant regarding the defendant's mental state. Dr. Hemmerich testified that his report was "somewhat conservative" when he stated that the defendant may have had a psychotic episode. Instead, during testimony, Dr. Hemmerich told the jury that in defendant's delusional system he believed that he was murdering his girlfriend or his mother. The prosecutor argued that this assessment was "garbage" because the defendant specifically stated that he wanted to have sex with the victim and the defendant's actions "had nothing to do with Annette Cathey or his mother." In reviewing the defendant's contention, we believe that even if the prosecutor's comments were improper, it has been frequently held that an improper argument will not constitute reversible error unless the alleged improper prosecutorial comments constituted a material factor in the defendant's conviction or if the comments resulted in substantial prejudice to the accused. (*Shum*, 117 Ill. 2d at 347; *People v. Baptist* (1979), 76 Ill. 2d 19, 29, 389 N.E.2d 1200; *Peo-*

*ple v. Cobb* (1989), 186 Ill. App. 3d 898, 914, 542 N.E.2d 1171; *White*, 181 Ill. App. 3d at 806.) We have carefully reviewed the record, and in light of the overwhelming evidence presented during the trial, we find that the prosecutor's comments did not constitute a material factor in the defendant's conviction nor did the comments result in substantial prejudice to the defendant.

Defendant also contends that his insanity defense was prejudiced when the prosecutor referred to it as a last resort effort since no other defense was available. The prosecutor identified other possible defenses during closing argument that were not used, *i.e.*, self-defense, accident, alibi, or someone else committing the crime and posed the question "Are you surprised about the defense of insanity?" The State was commenting on the evidence presented and reasonable inferences that could be drawn from the evidence when it implied that the insanity defense was the defendant's last resort. Comments by a prosecutor do not result in error if the evidence supports the argument. (*People v. McGee* (1982), 110 Ill. App. 3d 766, 776, 443 N.E.2d 1057.) In the present case, the evidence supports the argument that the defenses raised by the prosecutor were not available to the defendant.

Defendant finally argues that the prosecutor's closing argument was improper where it urged the jury to shift its concerns away from the insanity defense to sympathy for the victim when the prosecutor stated, "Let's talk about a 12 year old girl, not inkblots. \*\*\* We haven't heard from an important person, Sharon McCambry. But when you think about it, Sharon is speaking to you today \*\*\* through her blood \*\*\* through her shirt \*\*\* through her socks, with blood in them \*\*\* through the autopsy report that shows what the last few minutes of her life were about being beaten, sexually assaulted by that mean, vicious person." It is well settled that it is proper for the prosecutor to emphasize the evil results of a crime and urge the fearless administration of the law. (*People v. Harris* (1989), 129 Ill. 2d 123, 160, 544 N.E.2d 357; *People v. Owens* (1984), 102 Ill. 2d 88, 105-06, 464 N.E.2d 261; *People v. Jackson* (1981), 84 Ill. 2d 350, 360, 418 N.E.2d 739.) We believe that the prosecutor did not exceed the bounds of proper comment.

In this case, the prosecutor's arguments were inferences that could have reasonably been drawn from the evidence presented at trial. We, therefore, conclude that the trial judge's rulings did not constitute an abuse of discretion, and the prosecutorial comments in the case at bar were not so improper or prejudicial as to deny the defendant a fair trial.

Accordingly, for the reasons stated on this record, we cannot conclude that the trial court precluded the defendant from presenting his insanity defense nor was he denied his right to a fair and impartial trial. The judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.