THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY COLTS, Defendant-Appellant.

First District (2nd Division)   No. 1—91—0933

Opinion filed August 17, 1993.

Daniel J. Stohr, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Theodore F. Burtzos, Barbara Jones, and Joseph Alesia, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McCORMICK delivered the opinion of the court:

A jury found defendant, Larry Colts, guilty of attempted murder, and the trial court sentenced him to a term of 25 years' imprisonment. On appeal, defendant argues that the trial court erred by (1) denying his motion for discharge on speedy trial grounds; (2) admitting hearsay testimony; (3) overruling defense counsel's objection to defendant's volunteered alibi testimony; (4) permitting cross-examination concerning the alibi and defendant's lifestyle; (5) overruling objections to cross-examination of a defense witness; and (6) permitting improper closing argument. Defendant also asks this court to reverse because he did not receive effective assistance of counsel. We affirm.

Henry Sims grew up in the area of Grenshaw and Pulaski Streets in Chicago, where he became friends with defendant. Sims moved out of the neighborhood in 1980, but he visited the area almost every day. On September 21, 1989, Sims drove to that area with Amanda Simmons, his fiancee. Sims saw defendant with two other men. After speaking with one of the men, Sims verbally confronted defendant, then drove away.

Sims and Simmons returned to the area the next day. While they were talking to Herbert Gleason, a man carrying guns walked up behind Sims' car and fired several shots into the car, hitting Sims.

Simmons drove the car, from the passenger side, for several blocks to get away from the area. Once she felt safe enough, she moved to the driver's side and drove to Cook County Hospital, where Sims received treatment and answered police questions. The bullet wound has rendered Sims a paraplegic. Police arrested defendant on November 10, 1989, and charged him with attempted murder for shooting Sims.

# I

The assistant public defender representing defendant filed a written demand for trial on November 13, 1989, but the trial court continued the case to January 17, 1990. On that date, defendant agreed to a continuance to February 7. The State filed charges against defendant for a separate offense unrelated to this case, and the trial court set the new charge for status hearing on February 7. The record of the hearing shows that defendant demanded trial on the new charge, but it shows no discussion of the attempted murder charge. The trial court indicated that the new case was continued, on the State's motion, to February 27, 1990, but the record for this case indicates that defense counsel agreed to a continuance to February 27 on the attempted murder charge. Defendant did not appear in court on February 7.

Defense counsel agreed to further continuances to April 25 at a series of hearings for which defendant was not present in court. The April 25 transcript again indicates that defendant demanded trial on the newer charge, but it shows no discussion of the attempted murder charge. The half-sheet on the attempted murder charge shows a continuance by agreement to May 1, 1990. On May 1, the State dismissed the newer charge and defense counsel agreed to a continuance to May 4 on the charge of attempted murder.

On May 4, 1990, defense counsel demanded trial and said defendant "wanted to demand [trial]" at the May 1 hearing. The trial court granted the State's motion for a continuance. The trial court granted the State further continuances to June 25, 1990. Defendant petitioned for discharge due to violation of his right to a speedy trial. The trial court denied the motion and set the attempted murder charge for trial on June 26, 1990.

Defendant argues on appeal that the trial court should have granted his motion for discharge. The State must bring a defendant in custody to trial within 120 days of the date on which he is taken into custody unless the defendant causes the delay. (Ill. Rev. Stat. 1989, ch. 38, par. 103—5(a).) "A defendant is considered to have occasioned a delay when he requests a continuance, agrees to a continuance, or when his actions otherwise cause or contribute to a delay." (*People v. Grayson* (1988), 165 Ill. App. 3d 1038, 1041, 520 N.E.2d 901.) Defendant has the burden of establishing a violation of the statute. *People v. Turner* (1989), 128 Ill. 2d 540, 550, 539 N.E.2d 1196.

Clients are generally bound by the acts of their attorneys. *People v. Bowman* (1990), 138 Ill. 2d 131, 141, 561 N.E.2d 633.

"[T]he record need not always affirmatively show that when an attorney requests or agrees to a continuance, he has consulted

with and received the advice of the accused, because such a rule would intolerably burden the trial courts." (*Bowman*, 138 Ill. 2d at 142.)

Therefore, a defendant is bound by his counsel's request for a continuance, even if the request is made in the accused's absence, unless defendant overcomes the presumption that defense counsel acted on defendant's authorization. *Bowman*, 138 Ill. 2d at 142-43.

■ Defendant here has not presented any facts showing that counsel's agreements to continuances were unauthorized. Defendant has presented no facts concerning any of the continuances by agreement in this case apart from the continuance from May 1 to May 4. Counsel's single statement at the May 4 hearing that defendant wanted to demand trial on May 1 is insufficient to show that the original agreement to a continuance was unauthorized. Therefore, all of the continuances to which defense counsel agreed must be charged to defendant despite defendant's absence from court.

Defendant next maintains that the continuances granted on February 7 and May 1 were results of the State's motions. While the records of those hearings show that the State moved for continuances in proceedings on the unrelated charge against defendant, the record contains no discussion of proceedings on the attempted murder charge. The half-sheet indicates that defendant agreed to the continuances. Again, defendant has failed to meet his burden of establishing that he did not agree to those continuances.

■ Defendant's trial began 228 days after police arrested him. Defense counsel agreed to continuances from January 17, 1990, until May 4, 1990, for a total of 107 days. Defendant moved for discharge on June 25, 1990, which was the 120th day chargeable to the State. Time required for disposition of defendant's motions is delay caused by the defendant. (*People v. Smith* (1976), 42 Ill. App. 3d 731, 735, 356 N.E.2d 656.) Not all motions cause delays. "Whether a motion in fact causes delay depends on the facts and circumstances of each case, and the trial court must appraise the timeliness and complexity of the motion." *People v. Montenegro* (1990), 203 Ill. App. 3d 314, 317, 560 N.E.2d 934.

Before defendant brought his motion for discharge, prosecutors told the trial court they were prepared for trial. At the end of hearing on the motion, the trial court denied the motion and set trial for the next day. Although the motion for discharge was fairly straightforward, requiring only a relatively brief hearing, we find that the motion caused the one-day delay in the start of trial. Therefore we hold that the trial court did not violate defendant's right to a speedy trial.

## II

Defendant raises several issues related to evidence presented at trial. We review all of the evidence presented before discussing each evidentiary issue separately.

Sims testified that when he visited his old neighborhood the day before the shooting, after talking with one of the men he had seen with defendant, Sims asked defendant why Sims could no longer visit the neighborhood. Defendant said things were changing and since Sims "wasn't a New Breed [he] could no longer come around in the neighborhood," and if Sims returned to the neighborhood the gang "would deal with [him] severely." Amanda Simmons testified that she, too, heard defendant make this threat.

Sims testified that he had been a member of the Vice Lords, but he left the gang in 1986. Sims said that the New Breed was part of the Black Gangsters, which was a rival of the Vice Lords. Sims testified that defendant "is supposed to be[ ] the chief in that area" for the New Breed. On cross-examination, Sims admitted that Vice Lords and Black Gangsters cooperated at times, and he could not say whether they were operating on a friendly basis in 1989, because he was not then in either gang. Sims also said that Vice Lords chiefs often told other gang members to do jobs they wanted done, and he again admitted that he had heard defendant was a chief of the New Breed. Sims said on redirect that defendant's new position was the reason he wanted Sims out of the neighborhood. Defense counsel objected, then withdrew the objection. On re-cross-examination Sims admitted that he saw defendant a number of times between August 1989, when he was supposed to have become a chief, and September 21, when Sims said defendant first told him to leave the neighborhood.

Defendant's testimony concerning the confrontation on September 21 largely contradicted Sims' testimony. Defendant admitted at trial that he had been a member of the Black Gangsters in 1976, but he stopped all affiliations with gangs in 1980. Defendant testified that when he spoke with Sims on September 21, 1989, six or seven people were present, but Simmons was not there. Sims told defendant that the man he just spoke to told Sims he could no longer sell drugs in the neighborhood. Defendant told Sims he did not know anything about that. Sims pulled a gun on defendant then left the area.

Sims testified that on September 22 he returned to the area because he thought his brother had gone there, and he feared for his brother's safety. Sims saw his brother's friend, Herbert Gleason, driving in the area. Sims stopped his car and asked Gleason if he had seen his brother. Gleason said "no" and asked Sims what he was do-

ing. Sims testified that Gleason spoke with hesitation and shifted his eyes back and forth, looking behind Sims' car.

Sims looked in his rearview mirror and saw defendant and another man about 20 feet behind the car coming toward him, carrying guns. They came up within 5 or 10 feet of Sims on the driver's side of the car and shot Sims. Simmons confirmed that defendant was the man who shot Sims.

Sims testified that while he was in the hospital, two detectives asked him who shot him. Since he could not speak, he wrote down defendant's name. He believed he was dying.

Chicago police detective Loretta Prasad identified a photograph of Sims' car, and she noted the three bullet holes on the driver's side of the car which indicated shots fired at that side of the car. When Prasad visited defendant in the hospital, he was barely audible and had difficulty breathing. She told Sims that the doctors told her he had a 50% chance of survival and that he was partially paralyzed. She corroborated Sims' testimony that he wrote the name of the person who shot him for her. Another officer testified that after Sims identified defendant as the shooter, police obtained an arrest warrant.

Herbert Gleason testified that while he was talking with Sims and Simmons he saw a man he did not know standing on the sidewalk. The man stood behind Sims' car when he shot Sims. Gleason did not get a good look at the man, so he could not describe him in significant detail, but he was sure the man was not defendant. Gleason admitted that he did not warn Sims about the shooter even though he saw the man approach. After the shooting, Gleason drove to Bellwood. He did not call the police or emergency services, nor did he check on Sims' condition.

Gleason admitted that he was a former member of the Disciples, a street gang. He stated that the Disciples are enemies of the Vice Lords, but he had friends in the Disciples, New Breed and Vice Lords gangs. Gleason testified that the New Breed was the dominant gang in the area where Sims was shot.

Gleason admitted on direct examination that at the time of trial, he was on probation for a burglary conviction. The prosecutor again elicited this information, then asked whether other criminal charges were pending against Gleason. The trial court sustained defendant's objection. After a sidebar, the prosecutor elicited, yet again, the fact that Gleason was on probation for burglary.

During Gleason's cross-examination, the trial court called counsel into chambers to let them know he saw someone in the courtroom making gestures which appeared to be signals to Gleason. The two

men were brought into the judge's chambers. One admitted that he knew defendant, admitted shaking his head, but denied that he was directing his gestures to the witness. The trial court excluded him from the remainder of the trial. The trial court admonished the other man and told him that he was not to make any kind of signals in the courtroom. The prosecutor then asked Gleason, in open court, if anyone in the courtroom gallery had given him signals concerning his answers to cross-examination. Gleason said, "No."

Defendant testified on his own behalf. His attorney asked him whether he shot Sims. Defendant answered: "No, sir. I was over [at] my girlfriend's house." The trial court denied defense counsel's motion to strike everything after "No." The prosecutor asked defendant, "When was the first time you told anyone that you were at your girlfriend's at 4:20 p.m. on September 22nd?" Defendant answered, "I told my counselor that the other day when he asked."

Defendant testified that after the encounter with Sims on September 21, defendant went to a female friend's house for a while, then he went to another female friend's house, where he spent the night. He did not get much sleep that night, so he slept all afternoon when he came to his girl friend's house on September 22. He left his girl friend's house around 7 p.m. on September 22 and went to the home he shared with another woman. Defendant did not remember where he was on September 20, 24 or 25. Although he had been Sims' friend for 20 years, and he heard on September 23 that Sims had been shot, defendant never visited Sims in the hospital or in rehabilitation.

Defendant admitted on cross-examination that he was unemployed and living off the income of the woman he lived with in a place she owned. The prosecutor asked: "So you are a pimp?" The trial court sustained defense counsel's objection, instructed the jury to disregard and admonished the prosecutor.

## A

Defendant argues that the trial court improperly allowed Sims and Detective Prasad to give hearsay testimony about Sims' responses, in the hospital, to Prasad's questions. Defendant admits that his attorney did not object at trial, but he argues that this failure shows that he did not receive effective assistance of counsel.

Under section 115—12 of the Code of Criminal Procedure of 1963:

> "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person

made after perceiving him." (Ill. Rev. Stat. 1989, ch. 38, par. 115—12.)

Our supreme court clarified that under this statute, "a witness' prior statement of identification is admissible as substantive evidence *** when testified to by the witness or by a third person, such as a police officer, who was present when the witness made the identification." *People v. Hayes* (1990), 139 Ill. 2d 89, 140, 564 N.E.2d 803.

■ Here, Sims testified at trial, and defense counsel extensively cross-examined him, with no limitation preventing exploration of his hospital statement. The statement Sims made in the hospital identified defendant as the person who shot Sims, and Sims made the statement shortly after the shooting. Under the statute, both Sims and Prasad could testify concerning the out-of-court identification. (See *People v. Wehrwein* (1989), 190 Ill. App. 3d 35, 40-41, 545 N.E.2d 1005.) Defense counsel's failure to object to admissible testimony did not bring his representation below an objective standard of reasonableness.

Defendant next argues that the trial court improperly admitted hearsay concerning gangs into evidence. Sims testified that Vice Lords were rivals of the Black Gangsters, including the New Breed, but he admitted on cross-examination that he did not know whether Vice Lords and Black Gangsters were on friendly terms in 1989. Sims said that he heard that defendant moved up to be chief of the New Breed in that area, and Sims said that was why defendant shot him.

■ Defendant did not object to any of this testimony at trial; in fact, defense counsel brought out much of this evidence on cross-examination of Sims. By failing to object, defendant waived this issue. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) He asks this court to review the admission of this hearsay as plain error.

Plain error is an error which deprives defendant of a fair and impartial trial or any substantial error which occurs in a case where the evidence is closely balanced. (*People v. Schmidt* (1988), 168 Ill. App. 3d 873, 878, 522 N.E.2d 1317.) Defendant maintains that the evidence here is closely balanced. Sims testified that he saw the man who shot him come from behind his car to within 5 or 10 feet of the driver's side of his car before shooting him in broad daylight. Sims had known defendant for 20 years, and he unequivocally identified defendant as the shooter, both at trial and immediately after the shooting. Simmons, a second eyewitness, corroborated the identification. An eyewitness' positive identification of the offender, when the witness had ample opportunity to observe the offender, has been found to be sufficient to preclude application of the plain error doctrine. *People v. Dixon* (1985), 133 Ill. App. 3d 1073, 1085, 480 N.E.2d 128.

Defense witness Gleason said the shooter shot from behind the car; the photograph of the car showed bullet holes in the side of the car. Although Gleason considered Sims' brother a friend, and although he knew members of several gangs in the area, Gleason made no effort to find out who the shooter was. He could not describe the shooter, although he watched him come to the car, and he drove past him while leaving the scene. Defendant testified that he was with several women in the 24-hour period between his encounter with Sims and the shooting, but he could not remember where he was any other day around that time. Since Gleason's testimony and defendant's alibi were effectively impeached by their own conduct, physical evidence and the inherent implausibility of the testimony, defendant's evidence does not closely balance the unequivocal eyewitness identifications. See *People v. Herrett* (1990), 137 Ill. 2d 195, 210, 561 N.E.2d 1.

Defendant concedes that the trial court properly admitted into evidence Sims' testimony that he knew that the New Breed was a gang in the neighborhood and defendant said to him he could not come around the neighborhood because he was not a member of the New Breed. Even if the admission of further evidence of gang affiliation was error, the evidence was largely cumulative of properly admitted evidence of gang motivation. (See *People v. Davidson* (1987), 160 Ill. App. 3d 99, 119, 514 N.E.2d 17.) Since the evidence was not closely balanced and any error was not of such magnitude as to deny defendant a fair trial, we will not address the issue under the plain error doctrine. See *People v. Morgan* (1991), 142 Ill. 2d 410, 446, 568 N.E.2d 755.

Defendant does not advance counsel's failure to object to gang-related hearsay as grounds for finding counsel incompetent. The record shows that counsel made a strategic decision not to object, so that he could use the evidence to impeach Sims. Sims, on cross-examination, admitted that gang chiefs generally delegated jobs; the jury could infer that if defendant, a gang chief, wanted Sims shot, he would have sent someone else in the gang to do it. Since the failure to object was part of a reasonable strategic decision, it cannot provide grounds for finding counsel incompetent. See *People v. Williams* (1990), 139 Ill. 2d 1, 20, 563 N.E.2d 431.

Defendant also asserts that the trial court erred by permitting a detective to testify that after Sims identified his attacker, the detective obtained a warrant for defendant's arrest. "[A]n officer may properly testify concerning investigatory procedures." (*People v. Buckner* (1984), 121 Ill. App. 3d 391, 397, 459 N.E.2d 1102.) Defendant contends that the testimony was improper evidence of flight,

but the prosecutor did not, either in questioning or in closing argument, attempt to persuade the jury that the warrant showed that defendant tried to flee. Since the warrant is not, in itself, evidence of flight (see *People v. Wilson* (1987), 116 Ill. 2d 29, 52, 506 N.E.2d 571), we see no basis in this record for believing that the jury might have treated the warrant as evidence of flight. The trial court properly allowed the detective to testify that she obtained a warrant as part of the investigation procedures, prior to arresting defendant. (*People v. Chambers* (1989), 179 Ill. App. 3d 565, 583-84, 534 N.E.2d 554.) Defendant has not shown reversible error in the admission of hearsay testimony or testimony regarding the warrant.

## B

Defendant's next argument is that the trial court improperly allowed defendant to introduce an alibi defense, which led to the State's damaging cross-examination and closing argument concerning the alibi. During direct examination, in response to the question of whether he shot Sims, defendant volunteered that he was at his girl friend's house when the shooting occurred. Defense counsel moved to strike the volunteered part of the answer, but the trial court denied the motion.

The court generally must strike nonresponsive answers upon an appropriate motion by the party asking the question. (*People v. Fritz* (1981), 84 Ill. 2d 72, 80, 417 N.E.2d 612.) The general rule is designed "to allow the examining counsel to control the interrogation." 81 Am. Jur. 2d *Witnesses* § 761 (1992).

> "[I]t is an obvious requisite of orderly procedure that each side have a voice in determining the order in which the truth shall be told. *** But to deny the questioning attorney the privilege of having non-responsive answers stricken would make the course of direct examination infinitely more difficult and render cross examination virtually useless." (*United States v. Schneiderman* (S.D. Cal. 1952), 106 F. Supp. 892, 905.)

Thus, the right to object to nonresponsive answers is one facet of a party's right to present his case.

Defense counsel is defendant's agent for presentation of his case. (*People v. Wilkerson* (1984), 123 Ill. App. 3d 527, 532, 463 N.E.2d 139.) Strategic decisions involving counsel's specialized abilities are generally left to counsel's discretion, but "an accused represented by counsel retains a right to make decisions involving 'fundamental rights.' " (*People v. Campbell* (1984), 129 Ill. App. 3d 819, 821, 473 N.E.2d 129.) Defendant has a fundamental right to decide whether to testify in his own behalf. (*Campbell*, 129 Ill. App. 3d at 821.) "The

ultimate decision on whether to testify should be made by the defendant, with the advice of counsel." *People v. Knox* (1978), 58 Ill. App. 3d 761, 767, 374 N.E.2d 957.

■ Defendant's right to testify entails his right to convey his version of the facts to the jury, even if counsel advises him to the contrary. (*Knox*, 58 Ill. App. 3d at 766; see *United States ex rel. Wilcox v. Johnson* (3d Cir. 1977), 555 F.2d 115, 119.) Here, counsel sought to preclude defendant from testifying to his alibi. Defense counsel, as defendant's agent, does not have the right to object to defendant's testimony, because defendant cannot object to his own conduct. Accordingly, the trial court appropriately found defense counsel's objection to his principal's testimony "ludicrous."

Defendant relies on *Fritz* to support the argument that the trial court should have stricken part of his testimony. In *Fritz* the defendant's wife, on direct examination, volunteered testimony that her husband told her he was going to work on the day of the offense. The trial court overruled defense counsel's objection to the testimony as nonresponsive. Our supreme court found that the trial court committed reversible error because the defendant "did not intend to produce evidence that he was at work." *Fritz*, 84 Ill. 2d at 80.

Here, on the contrary, defendant showed his intent to produce evidence that he was at his girl friend's house by producing that evidence in his testimony. While defense counsel did not intend to produce this evidence, the decision of whether to testify to an alibi is not a matter for defense counsel's sole discretion. Defendant has a fundamental right to testify, and counsel's failure to ask for such testimony cannot preclude him from testifying to an alibi. The trial court properly overruled defense counsel's objection to defendant's volunteered testimony.

## C

Defendant also contends that he did not present an alibi defense, so the trial court should have sustained objections to the State's cross-examination of defendant concerning the alibi. A defendant presents an alibi when he presents competent evidence that he was at a specified place other than the crime scene at the time of the offense. (*Fritz*, 84 Ill. 2d at 76-78.) When counsel asked if defendant was at the crime scene at the time of the offense, defendant responded that he was at his girl friend's house. Defendant is competent to testify to his whereabouts at any time. (*Cf. Fritz*, 84 Ill. 2d at 78.) Therefore, defendant presented an alibi. The trial court properly allowed the prosecution to question defendant in an attempt to discredit the alibi. *People v. Madden* (1978), 57 Ill. App. 3d 107, 112, 372 N.E.2d 851.

■ Defendant specifically objects to the prosecutor's question concerning when he first told anyone of his alibi, contending that the question draws attention to defendant's post-arrest silence. Under *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the prosecution may not use a defendant's exercise of his constitutional right to remain silent, following *Miranda* warnings, against him. The rule does not apply to a defendant's failure to give statements to private parties. (*People v. Heidorn* (1983), 114 Ill. App. 3d 933, 938, 449 N.E.2d 568.) Such silence impeaches a witness' testimony if the witness had an opportunity to make a statement, and "under the circumstances, a person would normally have made the statement." *People v. Conley* (1989), 187 Ill. App. 3d 234, 244, 543 N.E.2d 138.

Here the prosecutor asked defendant when he first told anyone about his alibi, and defendant answered that he told counsel "the other day," apparently referring to a consultation a few days before trial. The prosecutor did not ask about defendant's silence during police questioning; instead, the prosecutor's question covered many conversations with private parties over an extended period of time. In the months prior to trial, defendant had ample opportunity to discuss his case with counsel and others, under circumstances in which a person would normally mention where he had been, if he had not been at the crime scene. The trial court properly overruled defendant's objection to the question.

●8 Defendant further objects to cross-examination which elicited the fact that defendant was unemployed and living off the income of the woman he lived with in September 1989. Defendant did not object to the questions at trial, waiving the issue for review. Since the evidence is not closely balanced, and the questions were not sufficiently prejudicial to deny defendant a fair trial, we will not address the issue under the plain error doctrine.

The prosecutor asked: "So you are a pimp?" The trial court immediately sustained defendant's objection, admonished the jury to disregard and reprimanded the prosecutor in open court. The question was a highly improper attempt to highlight defendant's immorality. (See *People v. Scaggs* (1982), 111 Ill. App. 3d 633, 636, 444 N.E.2d 674.) However, timely admonition to disregard may prevent error or render it harmless. (*People v. Gleash* (1991), 209 Ill. App. 3d 598, 608, 568 N.E.2d 348.) We find that the trial court's admonition and reprimand here were sufficient to cure any prejudice from the improper question.

## D

■ On direct examination Gleason admitted that he had been

convicted of burglary, and he was on probation for the offense at the time of trial. On cross, the prosecutor again elicited testimony that Gleason had been convicted of burglary, and then asked if there were other charges pending against him. The trial court immediately sustained defendant's objection. The prosecutor next asked if Gleason was on probation for burglary. Defendant now claims the entire line of questioning deprived him of a fair trial. Contrary to defendant's assertions, the prosecutor never asked about the details of the burglary, and he immediately dropped questioning about the pending cases when the trial court sustained an appropriate objection. (See *People v. Mason* (1963), 28 Ill. 2d 396, 400, 192 N.E.2d 835; *People v. Johnson* (1988), 170 Ill. App. 3d 828, 833-35, 525 N.E.2d 546.) Although the question concerning pending cases was improper, we find that the trial court, by promptly sustaining the objection, cured any error. See *Gleash*, 209 Ill. App. 3d at 608.

During Gleason's testimony, the trial court excluded one person from the courtroom because the court saw him making gestures which could have been signals to Gleason. The prosecutor asked Gleason, in open court, if anyone in the courtroom gallery had given him signals concerning his answers to cross-examination. Gleason said "no." Defendant now contends that the question was improper because the prosecutor was not prepared to prove the denial false.

When a spectator's actions in court could influence the jury, the court must assert control to guard against possible prejudice. (See *People v. Reed* (1929), 333 Ill. 397, 421, 164 N.E. 847.) Here, since the trial court saw gestures which it took to be signals, the jury may also have seen the same conduct. The subsequent question and Gleason's unchallenged denial should have alleviated any possible problem arising from jury observation of the gestures. The prosecutor's question did not insinuate that he had evidence the jury had not heard (*cf. People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353); instead, it addressed conduct in the court the jury could already have seen (see *People v. Hahn* (1976), 39 Ill. App. 3d 969, 974-75, 350 N.E.2d 839). The trial court properly allowed the question and answer to stand to guard against possible prejudice. See *People v. Minnis* (1983), 118 Ill. App. 3d 345, 359, 455 N.E.2d 209.

### III

Defendant argues that the prosecutor in closing argument committed prejudicial misconduct. In closing argument, the prosecutor emphasized that Sims' identification of defendant was highly credible because Sims believed he was dying when he first identified defendant as the shooter. The prosecutor also argued that defendant, as a

New Breed chief, had a motive to shoot Sims. The prosecutor then attacked the credibility of defense witnesses:

"What is a reasonable person going to do when they hear gunfire going off? They may take off, of course, but they are going to call the police ***. [Gleason] never went to the police to say you have the wrong guy, I was there, I was a witness, I saw this guy shoot. Not at all.

Herbert Gleason's actions back on September 22nd of 1989 are the most telling thing of all because when he saw the man with the gun he knew it was Larry Colts and he is from that area and he knows that Larry Colts is a big chief in the New Breed and that is the gang that controls that particular area. So when he saw Larry Colts with the gun come up and shoot what did he do, he took off because he is afraid of him and he didn't come forward he said until two or three days ago when he was asked to come to testify in this matter.

Is that reasonable? Is that logical? He knows someone is sitting in jail who didn't commit the offense but he is not going to come forward for months and months and months. He is going to wait until a couple of days before the trial when someone asks him and then he gets on the witness stand and lies to you about what happened on that evening.

You further heard the testimony of this defendant from the witness stand. The defendant stated to you that he knew where he was on September 22nd of 1989, the date this happened. He also told you the first time he told anybody about it was a few days ago."

In rebuttal the prosecutor continued to attack defendant's credibility:

"[Defendant] told you that he was with his girlfriend. Did his girlfriend come in to tell you that he was with her at that time? No.

MR. BUCHHOLZ [Defense counsel]: Objection, Judge.

* * *

THE COURT: Overruled.

MS. PERKINS [Prosecutor]: He also told you that he was with another girlfriend that evening. Did that girlfriend come in to tell you that she was with him? No.

* * *

The defendant, Larry Colts, would have you believe that on the day in question and the day before he can recall every single act that he did.

And, by the way, he must be some superman. He spends all night with—all evening with two women and then he goes and he spends the whole next day with another woman.

MR. BUCHHOLZ: Objection.

THE COURT: Overruled.

MS. PERKINS: And he would have you grown people believe this story, that he was just the lover of the west side and he was spending those two days loving but he never told you about any other days. He couldn't remember what he did on the 18th. He couldn't remember what he did on the 19th. He couldn't remember what he did on the 20th. He couldn't remember what he did on the 25th. He couldn't remember what he did on the 26th.

If he is such a great lover, he should have remembered what he did on those other days; but all the other days he just rode around, he just rode around.

Only on the 22nd, the evening of the 21st and the 22nd was he the great lover that he would have you believe he was."

Prosecutors have "wide latitude during closing argument to comment on the evidence presented, and the trial court's determination regarding the propriety of the closing argument will not be reversed on appeal absent a clear abuse of discretion." *People v. Williams* (1990), 205 Ill. App. 3d 715, 726, 564 N.E.2d 507.

■ First, defendant argues that the prosecutor impermissibly argued that, when he spoke to police in the hospital, Sims thought he was dying. Sims testified that he thought he was dying, so the argument is a permissible argument based on the evidence.

Sims also testified that defendant said to him, the day before the shooting, that Sims could no longer come to the neighborhood because Sims was not in the New Breed. The prosecutor could argue, on that basis, that defendant had a motive to shoot Sims because of defendant's gang affiliations. Similarly, the statement is admissible evidence that defendant was in the New Breed, and that evidence, together with Gleason's testimony that the New Breed controlled much of that territory, provides some basis for the prosecutor's inference that Gleason may fear defendant.

The prosecutor argued that defendant did not tell anyone about his alibi until a few days before trial, based on defendant's admissible response to the cross-examination question. The prosecutor made no reference to defendant's silence following arrest. The record here does not describe defendant's conduct following arrest. The record does not indicate whether defendant answered any questions, or even whether police ever asked him about this crime. The prosecutor here confined herself to inferences from the admissible evidence, and her remarks did not violate *Doyle*.

The prosecutor argued, over defendant's objection, that defendant failed to present the girl friends he was with on September 22 as alibi witnesses.

"If a defendant injects into a case his activities with potential witnesses during a particular period of time ostensibly for the purpose of establishing an alibi, his failure to produce such witnesses is a proper subject of comment on the part of the prosecution." (*People v. Pressley* (1987), 160 Ill. App. 3d 858, 866, 513 N.E.2d 921.) Prosecution comments here did not exceed proper bounds of response to the alibi defense defendant interjected in his testimony.

Defendant objects to the prosecutorial remarks referring to defendant as "some superman," "the lover of the west side" and "a great lover." If these comments had been an attack upon defendant's sexual morality, they would have been improper. (See *Scaggs*, 111 Ill. App. 3d at 636.) However, the context of the remarks shows that they do not address his sexual morality. Instead, the remarks were part of an attack on defendant's credibility, as the prosecutor commented that defendant characterized himself, implausibly, as a great lover. The prosecutor intended to persuade the jurors that they should not believe that defendant was "the lover of the west side," and accordingly they should not believe defendant's other testimony either. The prosecutor is entitled to comment on the credibility of the accused. (*People v. Carter* (1989), 177 Ill. App. 3d 593, 601, 532 N.E.2d 531.) We find that the trial court did not abuse its discretion by overruling defendant's objections to the closing argument.

## IV

■ Defendant finally contends that his counsel was ineffective because he did not use Sims' medical records to impeach Detective Prasad's testimony that she told Sims the doctor told her that Sims had a 50% chance of survival. We do not see how defendant could have suffered any significant prejudice from defense counsel's failure to impeach. Sims' hospital identification of defendant as the shooter was admissible irrespective of his medical condition. (See Ill. Rev. Stat. 1989, ch. 38, par. 115—12.) The prosecutor could as convincingly argue Sims' motive for an honest identification, based on his dire medical condition, even if Prasad had been impeached, because Sims testified that he believed he was dying. Also, we do not understand how medical records could impeach Prasad's testimony concerning what she told Sims. Prasad's statement to Sims was admissible only for its effect on Sims' state of mind; the statement would have that effect even if medical records proved Prasad misled Sims about the severity of his condition. Since defense counsel's alleged failure had no prejudicial effect on defendant's case, we reject this claim for ineffective assistance of counsel. We have already rejected defendant's other claim that counsel gave ineffective assistance by failing to object to Sims' testimony that, while he was in the hospital, he identified defendant as the man who shot him.

For the reasons stated above, the judgment of the trial court is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.